## DEMORE, DISTRICT DIRECTOR, SAN FRANCISCO DISTRICT OF IMMIGRATION AND NATURALI-ZATION SERVICE, ET AL. *v.* KIM

No. 01–1491.   Argued January 15, 2003—Decided April 29, 2003

REHNQUIST, C. J., delivered the opinion of the Court, in which KENNEDY, J., joined in full, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined as to Part I, and in which O'CONNOR, SCALIA, and THOMAS, JJ., joined as to all but Part I. KENNEDY, J., filed a concurring opinion, *post*, p. 531. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA and THOMAS, JJ., joined, *post*, p. 533. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 540. BREYER, J., filed an opinion concurring in part and dissenting in part, *post*, p. 576.

*Solicitor General Olson* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Austin C. Schlick, Donald E. Keener,* and *Mark C. Walters.*

*Judy Rabinovitz* argued the cause for respondent. With her on the brief were *Lucas Guttentag, Lee Gelernt, Steven R. Shapiro, A. Stephen Hut, Jr., Christopher J. Meade, Liliana M. Garces,* and *Jayashri Srikantiah.**

---

*\*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *Alfred P. Carlton, Jr.,* and *Jeffrey L. Bleich;* for Citizens and Immigrants for Equal Justice et al. by *Nancy Morawetz;* for International Human Rights Organizations by *William J. Aceves* and *Paul L. Hoffman;* for Law Professors by *Daniel Kanstroom;* for the National Asian Pacific American Legal Consortium et al. by *Richard A. Cordray, Eugene F. Chay, Vincent A. Eng,* and *William L. Taylor;* and for T. Alexander Aleinikoff et al. by *Anthony J. Orler.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Section 236(c) of the Immigration and Nationality Act, 66 Stat. 200, as amended, 110 Stat. 3009–585, 8 U. S. C. § 1226(c), provides that "[t]he Attorney General shall take into custody any alien who" is removable from this country because he has been convicted of one of a specified set of crimes. Respondent is a citizen of the Republic of South Korea. He entered the United States in 1984, at the age of six, and became a lawful permanent resident of the United States two years later. In July 1996, he was convicted of first-degree burglary in state court in California and, in April 1997, he was convicted of a second crime, "petty theft with priors." The Immigration and Naturalization Service (INS) charged respondent with being deportable from the United States in light of these convictions, and detained him pending his removal hearing.[1] We hold that Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons such as respondent be detained for the brief period necessary for their removal proceedings.

Respondent does not dispute the validity of his prior convictions, which were obtained following the full procedural protections our criminal justice system offers. Respondent also did not dispute the INS' conclusion that he is subject to

---

[1] App. to Pet. for Cert. 32a; see 8 U. S. C. §§ 1101(a)(43)(G), 1227(a)(2) (A)(iii). Section 1226(c) authorizes detention of aliens who have committed certain crimes including, *inter alia*, any "aggravated felony," §§ 1226(c)(1)(B), 1227(a)(2)(A)(iii), and any two "crimes involving moral turpitude," §§ 1226(c)(1)(B), 1227(a)(2)(A)(ii). Although the INS initially included only respondent's 1997 conviction in the charging document, it subsequently amended the immigration charges against him to include his 1996 conviction for first-degree burglary as another basis for mandatory detention and deportation. Brief for Petitioners 3, n. 2 (alleging that respondent's convictions reflected two "'crimes involving moral turpitude'").

mandatory detention under § 1226(c). See Brief in Opposition 1–2; App. 8–9.[2] In conceding that he was deportable, respondent forwent a hearing at which he would have been entitled to raise any nonfrivolous argument available to demonstrate that he was not properly included in a mandatory detention category. See 8 CFR § 3.19(h)(2)(ii) (2002); *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).[3] Respondent instead filed a habeas corpus action pursuant to 28 U. S. C. § 2241 in the United States District Court for the Northern District of California challenging the constitutionality of § 1226(c) itself. App. to Pet. for Cert. 2a. He argued that his detention under § 1226(c) violated due process because the INS had made no determination that he posed either a danger to society or a flight risk. *Id.,* at 31a, 33a.

The District Court agreed with respondent that § 1226(c)'s requirement of mandatory detention for certain criminal aliens was unconstitutional. *Kim* v. *Schiltgen,* No. C 99–

---

[2] As respondent explained: "The statute requires the [INS] to take into custody any alien who 'is deportable' from the United States based on having been convicted of any of a wide range of crimes. . . . [Respondent] does not challenge INS's authority to take him into custody after he finished serving his criminal sentence. His challenge is solely to Section 1226(c)'s absolute prohibition on his release from detention, even where, as here, the INS never asserted that he posed a danger or significant flight risk." Brief in Opposition 1–2.

[3] This "*Joseph* hearing" is immediately provided to a detainee who claims that he is not covered by § 1226(c). Tr. of Oral Arg. 22. At the hearing, the detainee may avoid mandatory detention by demonstrating that he is not an alien, was not convicted of the predicate crime, or that the INS is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention. See 8 CFR § 3.19(h)(2)(ii) (2002); *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). Because respondent conceded that he was deportable because of a conviction that triggers § 1226(c) and thus sought no *Joseph* hearing, we have no occasion to review the adequacy of *Joseph* hearings generally in screening out those who are improperly detained pursuant to § 1226(c). Such individualized review is available, however, and JUSTICE SOUTER is mistaken if he means to suggest otherwise. See *post,* at 555–556, 558 (opinion concurring in part and dissenting in part) (hereinafter dissent).

2257 SI (Aug. 11, 1999), App. to Pet. for Cert. 31a–51a. The District Court therefore granted respondent's petition subject to the INS' prompt undertaking of an individualized bond hearing to determine whether respondent posed either a flight risk or a danger to the community. *Id.*, at 50a. Following that decision, the District Director of the INS released respondent on $5,000 bond.

The Court of Appeals for the Ninth Circuit affirmed. *Kim* v. *Ziglar*, 276 F. 3d 523 (2002). That court held that § 1226(c) violates substantive due process as applied to respondent because he is a permanent resident alien. *Id.*, at 528. It noted that permanent resident aliens constitute the most favored category of aliens and that they have the right to reside permanently in the United States, to work here, and to apply for citizenship. *Ibid.* The court recognized and rejected the Government's two principal justifications for mandatory detention under § 1226(c): (1) ensuring the presence of criminal aliens at their removal proceedings; and (2) protecting the public from dangerous criminal aliens. The Court of Appeals discounted the first justification because it found that not all aliens detained pursuant to § 1226(c) would ultimately be deported. *Id.*, at 531–532. And it discounted the second justification on the grounds that the aggravated felony classification triggering respondent's detention included crimes that the court did not consider "egregious" or otherwise sufficiently dangerous to the public to necessitate mandatory detention. *Id.*, at 532–533. Respondent's crimes of first-degree burglary (burglary of an inhabited dwelling) and petty theft, for instance, the Ninth Circuit dismissed as "rather ordinary crimes." *Id.*, at 538. Relying upon our recent decision in *Zadvydas* v. *Davis*, 533 U. S. 678 (2001), the Court of Appeals concluded that the INS had not provided a justification "for no-bail civil detention sufficient to overcome a lawful permanent resident alien's liberty interest." 276 F. 3d, at 535.

Three other Courts of Appeals have reached the same conclusion. See *Patel* v. *Zemski,* 275 F. 3d 299 (CA3 2001); *Welch* v. *Ashcroft,* 293 F. 3d 213 (CA4 2002); *Hoang* v. *Comfort,* 282 F. 3d 1247 (CA10 2002). The Seventh Circuit, however, rejected a constitutional challenge to § 1226(c) by a permanent resident alien. *Parra* v. *Perryman,* 172 F. 3d 954 (1999). We granted certiorari to resolve this conflict, see 536 U. S. 956 (2002), and now reverse.

## I

We address first the argument that 8 U. S. C. § 1226(e) deprives us of jurisdiction to hear this case. See *Florida* v. *Thomas,* 532 U. S. 774, 777 (2001) ("Although the parties did not raise the issue in their briefs on the merits, we must first consider whether we have jurisdiction to decide this case"). An *amicus* argues, and the concurring opinion agrees, that § 1226(e) deprives the federal courts of jurisdiction to grant habeas relief to aliens challenging their detention under § 1226(c). See Brief for Washington Legal Foundation et al. as *Amici Curiae.* Section 1226(e) states:

> "(e) Judicial review
>
> "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."

The *amicus* argues that respondent is contesting a "decision by the Attorney General" to detain him under § 1226(c), and that, accordingly, no court may set aside that action. Brief for Washington Legal Foundation et al. as *Amici Curiae* 7–8.

But respondent does not challenge a "discretionary judgment" by the Attorney General or a "decision" that the Attorney General has made regarding his detention or release.

Rather, respondent challenges the statutory framework that permits his detention without bail. *Parra* v. *Perryman, supra,* at 957 ("Section 1226(e) likewise deals with challenges to operational decisions, rather than to the legislation establishing the framework for those decisions").

This Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster* v. *Doe,* 486 U. S. 592, 603 (1988); see also *Johnson* v. *Robison,* 415 U. S. 361, 367 (1974) (holding that provision barring review of " 'decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans' " did not bar constitutional challenge (emphasis deleted)). And, where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent. See *INS* v. *St. Cyr,* 533 U. S. 289, 308–309 (2001) (holding that title of provision, "Elimination of Custody Review by Habeas Corpus," along with broad statement of intent to preclude review, was not sufficient to bar review of habeas corpus petitions); see also *id.,* at 298 (citing cases refusing to find bar to habeas review where there was no specific mention of the Court's authority to hear habeas petitions); *id.,* at 327 (SCALIA, J., dissenting) (arguing that opinion established "a superclear statement, 'magic words' requirement for the congressional expression of" an intent to preclude habeas review).

Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail.

II

Having determined that the federal courts have jurisdiction to review a constitutional challenge to § 1226(c), we proceed to review respondent's claim. Section 1226(c) man-

dates detention during removal proceedings for a limited class of deportable aliens—including those convicted of an aggravated felony. Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens. See, *e. g.*, Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); S. Rep. No. 104–48, p. 1 (1995) (hereinafter S. Rep. 104–48) (confinement of criminal aliens alone cost $724 million in 1990). Criminal aliens were the fastest growing segment of the federal prison population, already constituting roughly 25% of all federal prisoners, and they formed a rapidly rising share of state prison populations as well. *Id.*, at 6–9. Congress' investigations showed, however, that the INS could not even *identify* most deportable aliens, much less locate them and remove them from the country. *Id.*, at 1. One study showed that, at the then-current rate of deportation, it would take 23 years to remove every criminal alien already subject to deportation. *Id.*, at 5. Making matters worse, criminal aliens who were deported swiftly reentered the country illegally in great numbers. *Id.*, at 3.

The INS' near-total inability to remove deportable criminal aliens imposed more than a monetary cost on the Nation. First, as Congress explained, "[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others." S. Rep. No. 104–249, p. 7 (1996). Second, deportable criminal aliens who remained in the United States often committed more crimes before being removed. One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began. Hearing on H. R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the

Judiciary, 101st Cong., 1st Sess., 54, 52 (1989) (hereinafter 1989 House Hearing); see also *Zadvydas,* 533 U. S., at 713–714 (KENNEDY, J., dissenting) (discussing high rates of recidivism for released criminal aliens).

Congress also had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings. See Department of Justice, Office of the Inspector General, Immigration and Naturalization Service, Deportation of Aliens After Final Orders Have Been Issued, Rep. No. I–96–03 (Mar. 1996), App. 46 (hereinafter Inspection Report) ("Detention is key to effective deportation"); see also H. R. Rep. No. 104–469, p. 123 (1995). The Attorney General at the time had broad discretion to conduct individualized bond hearings and to release criminal aliens from custody during their removal proceedings when those aliens were determined not to present an excessive flight risk or threat to society. See 8 U. S. C. § 1252(a) (1982 ed.). Despite this discretion to conduct bond hearings, however, in practice the INS faced severe limitations on funding and detention space, which considerations affected its release determinations. S. Rep. 104–48, at 23 ("[R]elease determinations are made by the INS in large part, according to the number of beds available in a particular region"); see also Reply Brief for Petitioners 9.

Once released, more than 20% of deportable criminal aliens failed to appear for their removal hearings. See S. Rep. 104–48, at 2; see also Brief for Petitioners 19.[4] The

---

[4] Although the Attorney General had authority to release these aliens on bond, it is not clear that *all* of the aliens released were in fact given individualized bond hearings. See Brief for Petitioners 19 ("[M]ore than 20% of criminal aliens who were released on bond *or otherwise not kept in custody* throughout their deportation proceedings failed to appear for those proceedings" (emphasis added)), citing S. Rep. 104–48, at 2. The evidence does suggest, however, that *many* deportable criminal aliens in this "released criminal aliens" sample received such determinations. See

dissent disputes that statistic, *post,* at 562–564 (opinion of SOUTER, J.), but goes on to praise a subsequent study conducted by the Vera Institute of Justice that more than confirms it. *Post,* at 565–566. As the dissent explains, the Vera study found that "77% of those [deportable criminal aliens] released on bond" showed up for their removal proceedings. *Post,* at 565. This finding—that one out of four criminal aliens released on bond absconded prior to the completion of his removal proceedings—is even more striking than the one-in-five flight rate reflected in the evidence before Congress when it adopted § 1226(c).[5] The Vera Institute study strongly supports Congress' concern that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight.

Congress amended the immigration laws several times toward the end of the 1980's. In 1988, Congress limited

---

Brief for Petitioners 19 (noting that, for aliens not evaluated for flight risk at a bond hearing, the prehearing skip rate doubled to 40%).

[5] The dissent also claims that the study demonstrated that "92% of criminal aliens . . . who were released under supervisory conditions attended all of their hearings." *Post,* at 565 (opinion of SOUTER, J.). The study did manage to raise the appearance rate for criminal aliens through a supervision program known as the Appearance Assistance Program (AAP). But the AAP study is of limited value. First, the study included only 16 aliens who, like respondent, were released from prison and charged with being deportable on the basis of an aggravated felony. 1 Vera Institute of Justice, Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program, pp. 33–34, 36 (Aug. 1, 2000). In addition, all 127 aliens in the AAP study were admitted into the study group only after being screened for "strength of family and community ties, appearance rates in prior legal proceedings, and eligibility to apply for a legal remedy." *Id.,* at 13; see also *id.,* at 37. Following this selection process, "supervision staff were in frequent, ongoing communication with participants," *id.,* at 14, through, among other things, required reporting sessions, periodic home visits, and assistance in retaining legal representation, *id.,* at 41–42. And, in any event, respondent seeks an individualized bond hearing, not "community supervision." The dissent's claim that criminal aliens released under supervisory conditions are likely to attend their hearings, *post,* at 565, therefore, is totally beside the point.

the Attorney General's discretion over custody determinations with respect to deportable aliens who had been convicted of aggravated felonies. See Pub. L. 100–690, Tit. VII, § 7343(a), 102 Stat. 4470. Then, in 1990, Congress broadened the definition of "aggravated felony," subjecting more criminal aliens to mandatory detention. See Pub. L. 101–649, Tit. V, § 501(a), 104 Stat. 5048. At the same time, however, Congress added a new provision, 8 U. S. C. § 1252(a)(2)(B) (1988 ed., Supp. II), authorizing the Attorney General to release permanent resident aliens during their deportation proceedings where such aliens were found not to constitute a flight risk or threat to the community. See Pub. L. 101–649, Tit. V, § 504(a)(5), 104 Stat. 5049.

During the same period in which Congress was making incremental changes to the immigration laws, it was also considering wholesale reform of those laws. Some studies presented to Congress suggested that detention of criminal aliens during their removal proceedings might be the best way to ensure their successful removal from this country. See, e. g., 1989 House Hearing 75; Inspection Report, App. 46; S. Rep. 104–48, at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond"). It was following those Reports that Congress enacted 8 U. S. C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability.

"In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews* v. *Diaz*, 426 U. S. 67, 79–80 (1976). The dissent seeks to avoid this fundamental premise of immigration law by repeatedly referring to it as "dictum." *Post*, at 547–549, n. 9 (opinion of SOUTER, J.). The Court in *Mathews*, however, made the statement the dissent now seeks to avoid in reliance on clear

precedent establishing that "'any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.'" 426 U. S., at 81, n. 17 (quoting *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952)). And, since *Mathews*, this Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens. See, *e. g.*, *Zadvydas*, 533 U. S., at 718 (KENNEDY, J., dissenting) ("The liberty rights of the aliens before us here are subject to limitations and conditions not applicable to citizens"); *Reno* v. *Flores*, 507 U. S. 292, 305–306 (1993) ("Thus, 'in the exercise of its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens"'" (quoting *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977), in turn quoting *Mathews, supra*, at 79–80)); *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 273 (1990).

In his habeas corpus challenge, respondent did not contest Congress' general authority to remove criminal aliens from the United States. Nor did he argue that he himself was not "deportable" within the meaning of § 1226(c).[6] Rather,

---

[6] Respondent's concession on this score is relevant for two reasons: First, because of the concession, respondent by his own choice did not receive one of the procedural protections otherwise provided to aliens detained under § 1226(c). And, second, because of the concession we do not reach a contrary argument raised by respondent for the first time in his brief on the merits in this Court. Specifically, in his brief on the merits, respondent suggests that he might not be subject to detention under § 1226(c) after all because his 1997 conviction for petty theft with priors might not qualify as an aggravated felony under recent Ninth Circuit precedent. Respondent now states that he intends to argue at his next removal hearing that "his 1997 conviction does not constitute an aggravated felony . . . and his 1996 conviction [for first-degree burglary] does not constitute either an aggravated felony or a crime involving moral turpitude." Brief for Respondent 11–12. As respondent has conceded that he is deportable for purposes of his habeas corpus challenge to § 1226(c) at all previous stages of this proceeding, see n. 3, *supra*, we decide the case on that basis.

respondent argued that the Government may not, consistent with the Due Process Clause of the Fifth Amendment, detain him for the brief period necessary for his removal proceedings. The dissent, after an initial detour on the issue of respondent's concession, see *post*, at 541–543 (opinion of SOUTER, J.), ultimately acknowledges the real issue in this case. *Post*, at 555–556, n. 11; see also Brief in Opposition 1–2 (explaining that respondent's "challenge is solely to Section 1226(c)'s absolute prohibition on his release from detention").

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Flores, supra,* at 306. At the same time, however, this Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process. As we said more than a century ago, deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." *Wong Wing* v. *United States,* 163 U. S. 228, 235 (1896); see also *Flores, supra,* at 305–306; *Zadvydas,* 533 U. S., at 697 (distinguishing constitutionally questioned detention there at issue from "detention pending a determination of removability"); *id.,* at 711 (KENNEDY, J., dissenting) ("Congress' power to detain aliens in connection with removal or exclusion . . . is part of the Legislature's considerable authority over immigration matters").[7]

In *Carlson* v. *Landon,* 342 U. S. 524 (1952), the Court considered a challenge to the detention of aliens who were deportable because of their participation in Communist ac-

---

Lest there be any confusion, we emphasize that by conceding he is *"deportable"* and, hence, subject to mandatory detention under § 1226(c), respondent did not concede that he *will ultimately be deported.* As the dissent notes, respondent has applied for withholding of removal. *Post,* at 541 (opinion of SOUTER, J.).

[7] In fact, prior to 1907 there was no provision permitting bail for *any* aliens during the pendency of their deportation proceedings. See §20, 34 Stat. 905.

tivities. The detained aliens did not deny that they were members of the Communist Party or that they were therefore deportable. *Id.*, at 530. Instead, like respondent in the present case, they challenged their detention on the grounds that there had been no finding that they were unlikely to appear for their deportation proceedings when ordered to do so. *Id.*, at 531–532; see also Brief for Petitioner in *Carlson* v. *Landon*, O. T. 1951, No. 35, p. 12 (arguing that legislative determinations could not justify "depriving [an alien] of his liberty without facts personal to the individual"). Although the Attorney General ostensibly had discretion to release detained Communist aliens on bond, the INS had adopted a policy of refusing to grant bail to those aliens in light of what Justice Frankfurter viewed as the mistaken "conception that Congress had made [alien Communists] in effect unbailable." 342 U. S., at 559, 568 (dissenting opinion).

The Court rejected the aliens' claims that they were entitled to be released from detention if they did not pose a flight risk, explaining "[d]etention is necessarily a part of this deportation procedure." *Id.*, at 538; see also *id.*, at 535. The Court noted that Congress had chosen to make such aliens deportable based on its "understanding of [Communists'] attitude toward the use of force and violence . . . to accomplish their political aims." *Id.*, at 541. And it concluded that the INS could deny bail to the detainees "by reference to the legislative scheme" even without any finding of flight risk. *Id.*, at 543; see also *id.*, at 550 (Black, J., dissenting) ("Denial [of bail] was not on the ground that if released [the aliens] might try to evade obedience to possible deportation orders"); *id.*, at 551, and n. 6.

The dissent argues that, even though the aliens in *Carlson* were not flight risks, "individualized findings of dangerousness were made" as to each of the aliens. *Post*, at 573 (opinion of SOUTER, J.). The dissent, again, is mistaken. The aliens in *Carlson* had *not* been found individually dangerous.

The only evidence against them was their membership in the Communist Party and "a degree . . . of participation in Communist activities." 342 U. S., at 541. There was no "individualized findin[g]" of likely future dangerousness as to any of the aliens and, in at least one case, there was a specific finding of nondangerousness.[8] The Court nonetheless concluded that the denial of bail was permissible "by reference to the legislative scheme to eradicate the evils of Communist activity." *Id.*, at 543.[9]

---

[8] See *Carlson* v. *Landon*, 342 U. S., at 549 (Black, J., dissenting) (noting that, in at least one case, the alien involved had been found "*'not* likely to engage in any subversive activities'" (emphasis added)); see also *id.*, at 550, n. 5 (quoting the District Judge's finding in case No. 35 that "'I don't know whether it is true . . . that their release is dangerous to the security of the United States'"); *id.*, at 552 ("[T]he bureau agent is *not* required to prove that a person he throws in jail is . . . 'dangerous'" (emphasis added)); see also *id.*, at 567 (Frankfurter, J., dissenting) ("[T]he Attorney General . . . did *not* deny bail from an individualized estimate of 'the danger to the public safety of [each person's] presence within the community'" (emphasis added)).

[9] Apart from its error with respect to the dangerousness determination, the dissent attempts to distinguish *Carlson* from the present case by arguing that the aliens in *Carlson* had engaged in "'personal activity'" in support of a political party Congress considered "'a menace to the pub-·lic.'" *Post*, at 569 (opinion of SOUTER, J.). In suggesting that this is a distinction, the dissent ignores the "personal activity" that aliens like respondent have undertaken in committing the crimes that subject them to detention in the first instance—personal activity that has been determined with far greater procedural protections than any finding of "active membership" in the Communist Party involved in *Carlson*. See 342 U. S., at 530 ("[T]he Director made allegation[s], supported by affidavits, that the Service's dossier of each petitioner contained evidence indicating to him that each was at the time of arrest a member of the Communist Party of the United States and had since 1930 participated . . . in the Party's indoctrination of others"). In the present case, respondent became "deportable" under § 1226(c) only following criminal convictions that were secured following full procedural protections. These convictions, moreover, reflect "personal activity" that Congress considered relevant to future dangerousness. Cf. *Zadvydas* v. *Davis*, 533 U. S. 678, 714 (2001) (KENNEDY, J., dissenting) (noting that "a criminal record accumulated by an

In *Reno* v. *Flores*, 507 U. S. 292 (1993), the Court considered another due process challenge to detention during deportation proceedings. The due process challenge there was brought by a class of alien juveniles. The INS had arrested them and was holding them in custody pending their deportation hearings. The aliens challenged the INS' policy of releasing detained alien juveniles only into the care of their parents, legal guardians, or certain other adult relatives. See, *e. g., id.*, at 297 (citing Detention and Release of Juveniles, 53 Fed. Reg. 17449 (1988) (codified as to deportation at 8 CFR § 242.24 (1992))). The aliens argued that the policy improperly relied "upon a 'blanket' presumption of the unsuitability of custodians other than parents, close relatives, and guardians" to care for the detained juvenile aliens. 507 U. S., at 313. In rejecting this argument, the Court emphasized that "reasonable presumptions and generic rules," even when made by the INS rather than Congress, are not necessarily impermissible exercises of Congress' traditional power to legislate with respect to aliens. *Ibid.;* see also *id.*, at 313–314 ("In the case of each detained alien juvenile, the INS makes those determinations that are specific to the individual and necessary to accurate application of the regulation . . . . The particularization and individuation need go no further than this"). Thus, as with the prior challenges to detention during deportation proceedings, the Court in *Flores* rejected the due process challenge and upheld the constitutionality of the detention.

Despite this Court's longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings, respondent argues that the narrow detention policy reflected in 8 U. S. C. § 1226(c) violates due process. Respondent, like

admitted alien" is a good indicator of future danger, and that "[a]ny suggestion that aliens who have completed prison terms no longer present a danger simply does not accord with the reality that a significant risk may still exist").

the four Courts of Appeals that have held § 1226(c) to be unconstitutional, relies heavily upon our recent opinion in *Zadvydas* v. *Davis*, 533 U. S. 678 (2001).

In *Zadvydas*, the Court considered a due process challenge to detention of aliens under 8 U. S. C. § 1231 (1994 ed., Supp. V), which governs detention following a final order of removal. Section 1231(a)(6) provides, among other things, that when an alien who has been ordered removed is not in fact removed during the 90-day statutory "removal period," that alien "may be detained beyond the removal period" in the discretion of the Attorney General. The Court in *Zadvydas* read § 1231 to authorize continued detention of an alien following the 90-day removal period for only such time as is reasonably necessary to secure the alien's removal. 533 U. S., at 699.

But *Zadvydas* is materially different from the present case in two respects.

First, in *Zadvydas*, the aliens challenging their detention following final orders of deportation were ones for whom removal was "no longer practically attainable." *Id.*, at 690. The Court thus held that the detention there did not serve its purported immigration purpose. *Ibid.* In so holding, the Court rejected the Government's claim that, by detaining the aliens involved, it could prevent them from fleeing prior to their removal. The Court observed that where, as there, "detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed." *Ibid.* (internal quotation marks and citation omitted).[10]

In the present case, the statutory provision at issue governs detention of deportable criminal aliens *pending their*

---

[10] The dissent denies this point, insisting that the detention at issue in *Zadvydas* actually did bear a reasonable relation to its immigration purpose. *Post,* at 561 (opinion of SOUTER, J.) ("[T]he statute in *Zadvydas* . . . served the purpose of preventing aliens . . . from fleeing prior to actual deportation").

*removal proceedings.* Such detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed. Respondent disagrees, arguing that there is no evidence that mandatory detention is necessary because the Government has never shown that individualized bond hearings would be ineffective. See Brief for Respondent 14. But as discussed above, see *supra,* at 519–520, in adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully.

Respondent argues that these statistics are irrelevant and do not demonstrate that individualized bond hearings "are ineffective or burdensome." Brief for Respondent 33–40. It is of course true that when Congress enacted § 1226, individualized bail determinations had not been tested under optimal conditions, or tested in all their possible permutations. But when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal. The evidence Congress had before it certainly supports the approach it selected even if other, hypothetical studies might have suggested different courses of action. Cf., *e. g., Los Angeles* v. *Alameda Books, Inc.,* 535 U. S. 425, 436–437 (2002); *Flores, supra,* at 315 ("It may well be that other policies would be even better, but 'we are [not] a legislature charged with formulating public policy'" (quoting *Schall* v. *Martin,* 467 U. S. 253, 281 (1984))).

*Zadvydas* is materially different from the present case in a second respect as well. While the period of detention at issue in *Zadvydas* was "indefinite" and "potentially permanent," 533 U. S., at 690–691, the detention here is of a much shorter duration.

*Zadvydas* distinguished the statutory provision it was there considering from § 1226 on these very grounds, noting that "post-removal-period detention, *unlike detention pending a determination of removability* . . . , has no obvious termination point." *Id.*, at 697 (emphasis added). Under §1226(c), not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas*.[11] The Executive Office for Immigration Review has calculated that, in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days. Brief for Petitioners 39–40. In the remaining 15% of cases, in which the alien appeals the decision of the immigration judge to the Board of Immigration Appeals, appeal takes an average of four months, with a median time that is slightly shorter. *Id.*, at 40.[12]

These statistics do not include the many cases in which removal proceedings are completed while the alien is still serving time for the underlying conviction. *Id.*, at 40,

---

[11] The dissent concedes that "[t]he scheme considered in *Zadvydas* did not provide review immediately . . . . [C]ustody review hearings usually occurred within three months of a transfer to a postorder detention unit." *Post*, at 555, n. 11 (opinion of SOUTER, J.). Yet, in discussing the present case, the dissent insists that "the due process requirement of an individualized finding of necessity applies to detention periods shorter than" respondent's. *Post*, at 568, n. 24 (citing *Schall* v. *Martin*, 467 U. S. 253, 270, 276–277 (1984), in which "the detainee was entitled to a hearing" when threatened with "a maximum detention period of 17 days"). The dissent makes no attempt to reconcile its suggestion that aliens are entitled to an immediate hearing with the holding in *Zadvydas* permitting aliens to be detained for several months prior to such a hearing.

[12] The very limited time of the detention at stake under § 1226(c) is not missed by the dissent. See *post*, at 568 (opinion of SOUTER, J.) ("Successful challenges often require several months"); *ibid.* (considering "[t]he potential for several months [worth] of confinement"); but see *post*, at 549 ("potentially lengthy detention").

n. 17.[13]   In those cases, the aliens involved are never subjected to mandatory detention at all.   In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal.[14]   Respondent was detained for some-

---

[13] Congress has directed the INS to identify and track deportable criminal aliens while they are still in the criminal justice system, and to complete removal proceedings against them as promptly as possible.   See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132, §§ 432, 438(a), 110 Stat. 1273–1276; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, §§ 326, 329, 110 Stat. 3009–630 to 3009–631 (codified at 8 U. S. C. § 1228).   The INS therefore established the Institutional Hearing Program (IHP) (subsequently subsumed under the "Institutional Removal Program").   By 1997, the General Accounting Office found that nearly half of all deportable criminal aliens' cases were completed through the IHP prior to the aliens' release from prison.   See General Accounting Office, Report to the Chairman, Subcommittee on Immigration and Claims of the House Committee on the Judiciary, INS' Efforts to Remove Imprisoned Aliens Continue to Need Improvement 10, Fig. 1 (Oct. 1998).   The report urged, however, that the INS needed to improve its operations in order to complete removal proceedings against all deportable criminal aliens before their release.   *Id.*, at 13.   Should this come to pass, of course, § 1226(c) and the temporary detention it mandates would be rendered obsolete.

[14] Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation.   See S. Rep. 104–48, at 2 ("Delays can earn criminal aliens more than work permits and wages—if they delay long enough they may even obtain U. S. citizenship").   Cf. *Zadvydas*, 533 U. S., at 713 (KENNEDY, J., dissenting) ("[C]ourt ordered release cannot help but encourage dilatory and obstructive tactics by aliens").   Respondent contends that the length of detention required to appeal may deter aliens from exercising their right to do so.   Brief for Respondent 32.   As we have explained before, however, "the legal system . . . is replete with situations requiring the making of difficult judgments as to which course to follow," and, even in the criminal context, there is no constitutional prohibition against requiring parties to make such choices.   *McGautha* v. *California*, 402 U. S. 183, 213 (1971) (internal quotation marks omitted); accord, *Chaffin* v. *Stynchcombe*, 412 U. S. 17, 30–31 (1973).

what longer than the average—spending six months in INS custody prior to the District Court's order granting habeas relief, but respondent himself had requested a continuance of his removal hearing.[15]

For the reasons set forth above, respondent's claim must fail. Detention during removal proceedings is a constitutionally permissible part of that process. See, *e. g., Wong Wing,* 163 U. S., at 235 ("We think it clear that detention, or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens would be valid"); *Carlson* v. *Landon,* 342 U. S. 524 (1952); *Reno* v. *Flores,* 507 U. S. 292 (1993). The INS detention of respondent, a criminal alien who has conceded that he is deportable, for the limited period of his removal proceedings, is governed by these cases. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE KENNEDY, concurring.

While the justification for 8 U. S. C. § 1226(c) is based upon the Government's concerns over the risks of flight and danger to the community, *ante,* at 518–521, the ultimate purpose behind the detention is premised upon the alien's deportability. As a consequence, due process requires individualized procedures to ensure there is at least some merit to the Immigration and Naturalization Service's (INS) charge and, therefore, sufficient justification to detain a lawful permanent resident alien pending a more formal hearing. See *Zadvydas* v. *Davis,* 533 U. S. 678, 690 (2001) ("[W]here detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which

---

[15] Respondent was held in custody for three months before filing his habeas petition. His removal hearing was scheduled to occur two months later, but respondent requested and received a continuance to obtain documents relevant to his withholding application. See Brief for Respondent 9, n. 12.

the individual was committed" (internal quotation marks and brackets omitted)); *id.,* at 718 (KENNEDY, J., dissenting) ("Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention"). If the Government cannot satisfy this minimal, threshold burden, then the permissibility of continued detention pending deportation proceedings turns solely upon the alien's ability to satisfy the ordinary bond procedures— namely, whether if released the alien would pose a risk of flight or a danger to the community. *Id.,* at 721 (KENNEDY, J., dissenting).

As the Court notes, these procedures were apparently available to respondent in this case. Respondent was entitled to a hearing in which he could have "raise[d] any non-frivolous argument available to demonstrate that he was not properly included in a mandatory detention category." *Ante,* at 514, and n. 3 (citing 8 CFR § 3.19(h)(2)(ii) (2002); *Matter of Joseph,* 22 I. & N. Dec. 799 (BIA 1999)). Had he prevailed in such a proceeding, the Immigration Judge then would have had to determine if respondent "could be considered . . . for release under the general bond provisions" of § 1226(a). *Id.,* at 809. Respondent, however, did not seek relief under these procedures, and the Court had no occasion here to determine their adequacy. *Ante,* at 514, n. 3.

For similar reasons, since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified. *Zadvydas,* 533 U. S., at 684–686; *id.,* at 721 (KENNEDY, J., dissenting) ("[A]liens are entitled to be free from detention that is arbitrary or capricious"). Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerous-

ness, but to incarcerate for other reasons. That is not a proper inference, however, either from the statutory scheme itself or from the circumstances of this case. The Court's careful opinion is consistent with these premises, and I join it in full.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

I join all but Part I of the Court's opinion because, a majority having determined there is jurisdiction, I agree with the Court's resolution of respondent's challenge on the merits. I cannot join Part I because I believe that 8 U. S. C. § 1226(e) unequivocally deprives federal courts of jurisdiction to set aside "any action or decision" by the Attorney General in detaining criminal aliens under § 1226(c) while removal proceedings are ongoing. That is precisely the nature of the action before us.

I

I begin with the text of the statute:

"The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside *any action or decision* by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." § 1226(e) (emphasis added).

There is no dispute that after respondent's release from prison in 1999, the Attorney General detained him "under this section," *i. e.*, under § 1226. And, the action of which respondent complains is one "regarding the detention or release of a[n] alien or the grant, revocation, or denial of bond or parole." § 1226(e). In my view, the only plausible reading of § 1226(e) is that Congress intended to prohibit federal courts from "set[ting] aside" the Attorney General's decision

to deem a criminal alien such as respondent ineligible for release during the limited duration of his or her removal proceedings.

I recognize both the "strong presumption in favor of judicial review of administrative action" and our "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *INS* v. *St. Cyr*, 533 U. S. 289, 298 (2001). I also acknowledge that Congress will not be deemed to have repealed habeas jurisdiction in the absence of a specific and unambiguous statutory directive to that effect. See *id.*, at 312–313; *Ex parte Yerger*, 8 Wall. 85, 105 (1869). Here, however, the signal sent by Congress in enacting § 1226(e) could not be clearer: *"No court* may set aside *any action or decision* . . . regarding the detention or release of any alien." (Emphasis added.) There is simply no reasonable way to read this language other than as precluding all review, including habeas review, of the Attorney General's actions or decisions to detain criminal aliens pursuant to § 1226(c).

In *St. Cyr*, the Court held that certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) do not strip federal courts of their jurisdiction to review an alien's habeas claim that he or she is eligible for a waiver of deportation. 533 U. S., at 312. I dissented in that case, and continue to believe it was wrongly decided. Nothing in *St. Cyr*, however, requires that we ignore the plain language and clear meaning of § 1226(e).

In *St. Cyr*, the Court stressed the significance of Congress' use of the term "judicial review" in each of the jurisdictional-limiting provisions at issue. In concluding that Congress had not intended to limit habeas jurisdiction by limiting "judicial review," the Court reasoned as follows:

> "The term 'judicial review' or 'jurisdiction to review' is the focus of each of these three provisions. In the im-

migration context, 'judicial review' and 'habeas corpus' have historically distinct meanings. See *Heikkila* v. *Barber*, 345 U. S. 229 (1953). In *Heikkila*, the Court concluded that the finality provisions at issue 'preclud[ed] judicial review' to the maximum extent possible under the Constitution, and thus concluded that the [Administrative Procedure Act] was inapplicable. *Id.*, at 235. Nevertheless, the Court reaffirmed the right to habeas corpus. *Ibid.* Noting that the limited role played by the courts in habeas corpus proceedings was far narrower than the judicial review authorized by the APA, the Court concluded that 'it is the scope of inquiry on habeas corpus that differentiates' habeas review from 'judicial review.'" *Id.*, at 311–312.

In this case, however, § 1226(e) does not mention any limitations on "judicial review." To be sure, the first sentence of § 1226(e) precludes "review" of the Attorney General's "discretionary judgment[s]" to detain aliens under § 1226(c). But the second sentence is not so limited, and states unequivocally that "[n]o court may set aside any action or decision" to detain an alien under § 1226(c). It cannot seriously be maintained that the second sentence employs a term of art such that "no court" does not really mean "no court," or that a decision of the Attorney General may not be "set aside" in actions filed under the Immigration and Naturalization Act but may be set aside on habeas review.

Congress' use of the term "Judicial review" as the title of § 1226(e) does not compel a different conclusion. As the Court stated in *St. Cyr*, "a title alone is not controlling," *id.*, at 308, because the title of a statute has no power to give what the text of the statute takes away. Where as here the statutory text is clear, "'the title of a statute . . . cannot limit the plain meaning of the text.'" *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) (quoting *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 528–529 (1947)).

The Court also focused in *St. Cyr* on the absence of any language in the relevant statutory provisions making explicit reference to habeas review under 28 U. S. C. § 2241. See 533 U. S., at 313, n. 36. This statutory silence spoke volumes, the Court reasoned, in light of the "historic use of § 2241 jurisdiction as a means of reviewing deportation and exclusion orders," *ibid.* In contrast, there is no analogous history of routine reliance on habeas jurisdiction to challenge the detention of aliens without bail pending the conclusion of removal proceedings. We have entertained such challenges only twice, and neither was successful on the merits. See *Reno* v. *Flores,* 507 U. S. 292 (1993); *Carlson* v. *Landon,* 342 U. S. 524 (1952). See also Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1067, n. 120 (1998) (distinguishing detention pursuant to a final order of removal from the interlocutory detention at issue here). Congress' failure to mention § 2241 in this context therefore lacks the significance that the Court accorded Congress' silence on the issue in *St. Cyr.* In sum, nothing in *St. Cyr* requires us to interpret 8 U. S. C. § 1226(e) to mean anything other than what its plain language says.

I recognize that the two Courts of Appeals that have considered the issue have held that § 1226(e) does not preclude habeas claims such as respondent's. See *Patel* v. *Zemski,* 275 F. 3d 299 (CA3 2001); *Parra* v. *Perryman,* 172 F. 3d 954 (CA7 1999). In *Parra,* the Seventh Circuit held that § 1226(e) does not bar "challenges to § 1226(c) itself, as opposed to decisions implementing that subsection." *Id.,* at 957. Though the Court's opinion today relies heavily on this distinction, I see no basis for importing it into the plain language of the statute.

The Seventh Circuit sought support from our decision in *Reno* v. *American-Arab Anti-Discrimination Comm.,* 525 U. S. 471 (1999) *(AADC),* but our holding there supports my reading of § 1226(e). In *AADC,* the Court construed a statute that sharply limits review of claims "arising from the

decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this [Act]." 8 U. S. C. § 1252(g) (1994 ed., Supp. III). The Court concluded that this provision imposes jurisdictional limits only on claims addressing one of the three "'decision[s] or action[s]'" specifically enumerated in the statute. *AADC, supra,* at 482. Nowhere in *AADC* did the Court suggest, however, that the statute's jurisdictional limits might not apply depending on the particular grounds raised by an alien for challenging the Attorney General's decisions or actions in these three areas. *AADC* therefore provides no support for imposing artificial limitations on the broad scope of 8 U. S. C. § 1226(e).

## II

Because § 1226(e) plainly deprives courts of federal habeas jurisdiction over claims that mandatory detention under § 1226(c) is unconstitutional, one could conceivably argue that such a repeal violates the Suspension Clause, which provides as follows: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, § 9, cl. 2. The clarity of § 1226(e)'s text makes such a question unavoidable, unlike in *St. Cyr*, where the Court invoked the doctrine of constitutional doubt and interpreted the relevant provisions of AEDPA and IIRIRA not to repeal habeas jurisdiction. *St. Cyr, supra,* at 314; see also *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 57, n. 9 (1996) (where the text of a statute is clear, the "preference for avoiding a constitutional question" cannot be invoked to defeat the plainly expressed intent of Congress).

In my view, any argument that § 1226(e) violates the Suspension Clause is likely unavailing. *St. Cyr* held that "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" 533 U. S., at 301 (quoting *Felker* v. *Turpin,* 518 U. S. 651, 663–664 (1996)). The consti-

tutionality of § 1226(e)'s limitation on habeas review therefore turns on whether the writ was generally available to those in respondent's position in 1789 (or, possibly, thereafter) to challenge detention during removal proceedings.

Admittedly, discerning the relevant habeas corpus law for purposes of Suspension Clause analysis is a complex task. Nonetheless, historical evidence suggests that respondent would not have been permitted to challenge his temporary detention pending removal until very recently. Because colonial America imposed few restrictions on immigration, there is little case law prior to that time about the availability of habeas review to challenge temporary detention pending exclusion or deportation. See *St. Cyr, supra,* at 305. The English experience, however, suggests that such review was not available:

> "In England, the only question that has ever been made in regard to the power to expel aliens has been whether it could be exercised by the King without the consent of Parliament. It was formerly exercised by the King, but in later times by Parliament, which passed several acts on the subject between 1793 and 1848. Eminent English judges, sitting in the Judicial Committee of the Privy Council, have gone very far in supporting the exclusion or expulsion, by the executive authority of a colony, of aliens having no absolute right to enter its territory or to remain therein." *Fong Yue Ting* v. *United States,* 149 U. S. 698, 709 (1893) (citations omitted).

In this country, Congress did not pass the first law regulating immigration until 1875. See 18 Stat. (pt. 3) 477. In the late 19th century, as statutory controls on immigration tightened, the number of challenges brought by aliens to Government deportation or exclusion decisions also increased. See *St. Cyr, supra,* at 305–306. Because federal immigration laws from 1891 until 1952 made no express provision for judicial review, what limited review existed took the form of pe-

titions for writs of habeas corpus. See, *e. g., Ekiu* v. *United States*, 142 U. S. 651 (1892); *Fong Yue Ting* v. *United States, supra; The Japanese Immigrant Case*, 189 U. S. 86 (1903); *Chin Yow* v. *United States*, 208 U. S. 8 (1908); *Kwock Jan Fat* v. *White*, 253 U. S. 454 (1920); *Ng Fung Ho* v. *White*, 259 U. S. 276 (1922). Though the Court was willing to entertain these habeas challenges to Government exclusion and deportation decisions, in no case did the Court question the right of immigration officials to temporarily detain aliens while exclusion or deportation proceedings were ongoing.

By the mid-20th century, the number of aliens in deportation proceedings being released on parole rose considerably. See, *e. g., Carlson* v. *Landon*, 342 U. S., at 538, n. 31. Nonetheless, until 1952 habeas corpus petitions remained the only means by which deportation orders could be challenged. *Heikkila* v. *Barber*, 345 U. S. 229, 236–237 (1953). Under this regime, an alien who had been paroled but wished to challenge a final deportation order had to place himself in Government custody before filing a habeas petition challenging the order. *Bridges* v. *Wixon*, 326 U. S. 135, 140 (1945). Given this, it is not surprising that the Court was not faced with numerous habeas claims brought by aliens seeking release from detention pending deportation.

So far as I am aware, not until 1952 did we entertain such a challenge. See *Carlson* v. *Landon, supra*. And there, we reaffirmed the power of Congress to order the temporary detention of aliens during removal proceedings. *Id.*, at 538. In *Reno* v. *Flores*, we likewise rejected a similar challenge to such detention. And, *Flores* was a wide-ranging class action in which 28 U. S. C. § 2241 was but one of several statutes invoked as the basis for federal jurisdiction. 507 U. S., at 296. All in all, it appears that in 1789, and thereafter until very recently, the writ was not generally available to aliens to challenge their detention while removal proceedings were ongoing.

Because a majority of the Court has determined that jurisdiction exists over respondent's claims, I need not conclusively decide the thorny question whether 8 U. S. C. § 1226(e) violates the Suspension Clause. For present purposes, it is enough to say that in my view, § 1226(e) unambiguously bars habeas challenges to the Attorney General's decisions regarding the temporary detention of criminal aliens under § 1226(c) pending removal. That said, because a majority of the Court has determined that there is jurisdiction, and because I agree with the majority's resolution of the merits of respondent's challenge, I join in all but Part I of the Court's opinion.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, concurring in part and dissenting in part.

Respondent Kim is an alien lawfully admitted to permanent residence in the United States. He claims that the Constitution forbids the Immigration and Naturalization Service (INS) from detaining him under 8 U. S. C. § 1226(c) unless his detention serves a government interest, such as preventing flight or danger to the community. He contends that due process affords him a right to a hearing before an impartial official,[1] giving him a chance to show that he poses no risk that would justify confining him between the moment the Government claims he is removable and the adjudication of the Government's claim.

I join Part I of the Court's opinion, which upholds federal jurisdiction in this case, but I dissent from the Court's dispo-

---

[1] Kim does not claim a hearing before any specific official. The generality of his claim may reflect the fact, noted just below, that the INS released him on bond without any hearing whatsoever after the District Court entered its judgment in this case. App. 11–13. Accordingly, there is no occasion to enquire whether due process requires 'access to any particular arbiter, such as one unaffiliated with the INS. I therefore use the neutral term "impartial" in describing the hearing Kim claims.

sition on the merits. The Court's holding that the Constitution permits the Government to lock up a lawful permanent resident of this country when there is concededly no reason to do so forgets over a century of precedent acknowledging the rights of permanent residents, including the basic liberty from physical confinement lying at the heart of due process. The INS has never argued that detaining Kim is necessary to guarantee his appearance for removal[2] proceedings or to protect anyone from danger in the meantime. Instead, shortly after the District Court issued its order in this case, the INS, *sua sponte* and without even holding a custody hearing, concluded that Kim "would not be considered a threat" and that any risk of flight could be met by a bond of $5,000. App. 11–13. He was released soon thereafter, and there is no indication that he is not complying with the terms of his release.

The Court's approval of lengthy mandatory detention can therefore claim no justification in national emergency or any risk posed by Kim particularly. The Court's judgment is unjustified by past cases or current facts, and I respectfully dissent.

## I

At the outset, there is the Court's mistaken suggestion that Kim "conceded" his removability, *ante*, at 514, 523, and n. 6, 531. The Court cites no statement before any court conceding removability, and I can find none. At the first opportunity, Kim applied to the Immigration Court for withholding of removal, Brief for Respondent 9, n. 12, and he

---

[2] In 1996, Congress combined "deportation" and "exclusion" proceedings into a single "removal" proceeding. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, §304(a), 110 Stat. 3009–587, adding 8 U. S. C. §1229a. Because this case requires consideration of cases decided both before and after 1996, this opinion refers to "removal" generally but, where the context requires, distinguishes between "deportation" of aliens who have entered the United States and "exclusion" of aliens who seek entry.

represents that he intends to assert that his criminal convictions are not for removable offenses and that he is independently eligible for statutory relief from removal, *id.*, at 11–12; see also *ante,* at 522–523, n. 6. In his brief before the Ninth Circuit, Kim stated that his removability was "an open question," that he was "still fighting [his] removal administratively," and that the Immigration Court had yet to hold a merits hearing. Brief of Petitioner-Appellee in No. 99–17373 (CA9), pp. 4, 13–14, 24, 33–34, and n. 28, 48–49. At oral argument here, his counsel stated that Kim was challenging his removability. See Tr. of Oral Arg. 36–38, 44.

The suggestion that Kim should have contested his removability in this habeas corpus petition, *ante,* at 522–523, and n. 6, misses the point that all he claims, or could now claim, is that his detention pending removal proceedings violates the Constitution. Challenges to removability itself, and applications for relief from removal, are usually submitted in the first instance to an immigration judge. See 8 U. S. C. § 1229a(a)(3). The Immigration Judge had not yet held an initial hearing on the substantive issue of removability when Kim filed his habeas petition in the District Court, even though Kim had been detained for over three months under § 1226(c). If Kim's habeas corpus petition had claimed "that he himself was not 'deportable,'" as the Court suggests it should have, *ante,* at 522, the District Court would probably have dismissed the claim as unexhausted. *E. g., Espinal* v. *Filion,* No. 00–CIV–2647–HB–JCF, 2001 WL 395196 (SDNY, Apr. 17, 2001). Kim did not, therefore, "conced[e] that he is deportable," *ante,* at 531, by challenging removability before the Immigration Judge and challenging detention in a federal court.[3]

_____

[3] The Court's effort to explain its reference to a nonexistent concession, *ante,·* at 522–523, n. 6, seeks to gain an advantage from the fact that the Immigration and Nationality Act uses the word "deportable" in various ways, one being to describe classes of aliens who may be removed if the necessary facts are proven, *e. g.,* § 1227(a), and another to describe aliens who have actually been adjudged as being in the United States unlawfully,

Kim may continue to claim the benefit of his current status unless and until it is terminated by a final order of removal. 8 CFR § 1.1(p) (2002). He may therefore claim the due process to which a lawful permanent resident is entitled.

## II

### A

It has been settled for over a century that all aliens within our territory are "persons" entitled to the protection of the Due Process Clause. Aliens "residing in the United States for a shorter or longer time, are entitled, so long as they are permitted by the government of the United States to remain in the country, to the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person and of property, and to their civil and criminal responsibility." *Fong Yue Ting* v. *United States,* 149 U. S. 698, 724 (1893). *The Japanese Immigrant Case,* 189 U. S. 86, 100–101 (1903), settled any lingering doubt that the Fifth Amendment's Due Process Clause gives aliens a right to challenge mistreatment of their person or property.

The constitutional protection of an alien's person and property is particularly strong in the case of aliens lawfully

---

*e. g.,* § 1229b. An alien is not adjudged "deportable" until an order enters "concluding that the alien is deportable or ordering deportation," and such an order is not final until affirmed by the Board of Immigration Appeals or until the time expires for seeking review. §§ 1101(a)(47)(A)–(B). To suggest, as the Court seems to do, that an alien has conceded removability simply because he does not dispute that he has been charged with facts that will render him removable if those facts are later proven is like saying that a civil defendant has conceded liability by failing to move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) or that a criminal defendant has conceded guilt by failing to dispute the validity of the indictment. But even if the Court's reasoning were sound, it would not cover Kim's situation, for he has stated (and the Court acknowledges) his intent to contest the sufficiency of his criminal convictions as a basis for removal. *Ante,* at 522–523, n. 6. This discussion, which the Court calls a "detour," *ante,* at 523, is necessary only because of the Court's insistence in stating that Kim conceded that he is "deportable." *Ante,* at 513, 522, 531.

admitted to permanent residence (LPRs). The immigration laws give LPRs the opportunity to establish a life permanently in this country by developing economic, familial, and social ties indistinguishable from those of a citizen. In fact, the law of the United States goes out of its way to encourage just such attachments by creating immigration preferences for those with a citizen as a close relation, 8 U. S. C. §§ 1153(a)(1), (3)–(4), and those with valuable professional skills or other assets promising benefits to the United States, §§ 1153(b)(1)–(5).

Once they are admitted to permanent residence, LPRs share in the economic freedom enjoyed by citizens: they may compete for most jobs in the private and public sectors without obtaining job-specific authorization, and apart from the franchise, jury duty, and certain forms of public assistance, their lives are generally indistinguishable from those of United States citizens. That goes for obligations as well as opportunities. Unlike temporary, nonimmigrant aliens, who are generally taxed only on income from domestic sources or connected with a domestic business, 26 U. S. C. § 872, LPRs, like citizens, are taxed on their worldwide income, 26 CFR §§ 1.1–1(b), 1.871–1(a), 1.871–2(b) (2002). Male LPRs between the ages of 18 and 26 must register under the Selective Service Act of 1948, ch. 625, Tit. I, § 3, 62 Stat. 605.[4] "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society." *In re Griffiths*, 413 U. S. 717, 722 (1973). And if they choose, they may apply for full membership in the national polity through naturalization.

The attachments fostered through these legal mechanisms are all the more intense for LPRs brought to the United States as children. They grow up here as members of the society around them, probably without much touch with their country of citizenship, probably considering the United

---

[4] Although an LPR may seek exemption or discharge from registration on the grounds of alienage, such an action permanently bars the LPR from seeking United States citizenship. 8 U. S. C. § 1426(a).

States as home just as much as a native-born, younger brother or sister entitled to United States citizenship. "[M]any resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become naturalized citizens." *Woodby* v. *INS*, 385 U. S. 276, 286 (1966). Kim is an example. He moved to the United States at the age of six and was lawfully admitted to permanent residence when he was eight. His mother is a citizen, and his father and brother are LPRs. LPRs in Kim's situation have little or no reason to feel or to establish firm ties with any place besides the United States.[5]

Our decisions have reflected these realities. As early as 1892, we addressed an issue of statutory construction with the realization that "foreigners who have become domiciled in a country other than their own, acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country, and no restriction on the footing upon which such persons stand by reason of their domicil of choice . . . is to be presumed." *Lau Ow Bew* v. *United States*, 144 U. S. 47, 61–62.[6] Fifty years later in dealing with a question of evidentiary competence in *Bridges* v. *Wixon*, 326 U. S. 135 (1945), we said that "the notions of fairness on which our legal system is founded" applied with full force to "aliens whose roots may have become, as

---

[5] See also *Welch* v. *Ashcroft*, 293 F. 3d 213, 215 (CA4 2002) (detainee obtained LPR status at age 10); *Hoang* v. *Comfort*, 282 F. 3d 1247, 1252–1253 (CA10 2002) (ages 3 and 15), cert. pending, No. 01–1616 [REPORTER'S NOTE: See *post*, p. 1010].

[6] In *The Venus*, 8 Cranch 253 (1814), we held that property belonging to American citizens who were resident in England during the War of 1812 was to be treated as belonging to English proprietors for purposes of prize law. We stated that, as permanent residents of England, the American citizens were "bound, by such residence, to the society of which they are members, subject to the laws of the state, and owing a qualified allegiance thereto; they are obliged to defend it, (with an exception in favor of such a subject, in relation to his native country) in return for the protection it affords them, and the privileges which the laws bestow upon them as subjects," *id.*, at 282.

they are in the present case, deeply fixed in this land," *id.*, at 154.  And in *Kwong Hai Chew* v. *Colding,* 344 U. S. 590 (1953), we read the word "excludable" in a regulation as having no application to LPRs, since such a reading would have been questionable given "a resident alien's constitutional right to due process." *Id.*, at 598–599.[7]  *Kwong Hai Chew* adopted the statement of Justice Murphy, concurring in *Bridges,* that "'once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.  Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment.  None of these provisions acknowledges any distinction between citizens and resident aliens.  They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.'"  344 U. S., at 596–597, n. 5 (quoting *Bridges, supra,* at 161).  See also *United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); *Woodby, supra,* at 285 (holding that deportation orders must be supported by clear, unequivocal, and convincing evidence owing to the "drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification"); *Johnson* v. *Eisentrager,* 339 U. S. 763, 770–771 (1950) ("The alien, to whom the United States has been tradi-

---

[7] "Although the holding [in *Kwong Hai Chew*] was one of regulatory interpretation, the rationale was one of constitutional law.  Any doubts that *Chew* recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by *Rosenberg* v. *Fleuti,* [374 U. S. 449 (1963),] where we described *Chew* as holding 'that the returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him.'  374 U. S., at 460." *Landon* v. *Plasencia,* 459 U. S. 21, 33 (1982).

tionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. . . . [A]t least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties—such as the due process of law of the Fourteenth Amendment").

The law therefore considers an LPR to be at home in the United States, and even when the Government seeks removal, we have accorded LPRs greater protections than other aliens under the Due Process Clause. In *Landon* v. *Plasencia,* 459 U. S. 21 (1982), we held that a long-term resident who left the country for a brief period and was placed in exclusion proceedings upon return was entitled to claim greater procedural protections under that Clause than aliens seeking initial entry. The LPR's interest in remaining in the United States is, we said, "without question, a weighty one." *Id.,* at 34. See also *Rosenberg* v. *Fleuti,* 374 U. S. 449 (1963); *Kwong Hai Chew, supra.*

Although LPRs remain subject to the federal removal power, that power may not be exercised without due process, and any decision about the requirements of due process for an LPR must account for the difficulty of distinguishing in practical as well as doctrinal terms between the liberty interest of an LPR and that of a citizen.[8] In evaluating Kim's challenge to his mandatory detention under 8 U. S. C. § 1226(c), the only reasonable starting point is the traditional doctrine concerning the Government's physical confinement of individuals.[9]

---

[8] This case provides no occasion to determine the constitutionality of mandatory detention of aliens other than LPRs.

[9] The statement that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens," *Mathews* v. *Diaz,* 426 U. S. 67, 79–80 (1976), cannot be read to leave limitations on the liberty of aliens unreviewable. *Ante,* at 521–522. *Diaz* involved a federal statute that limited eligibility for a federal medical insurance program to United States citizens and LPRs who had been continuously resident in the United States

## B

Kim's claim is a limited one: not that the Government may not detain LPRs to ensure their appearance at removal hear-

for five years. 426 U. S., at 69–70. Reversing a lower court judgment that this statute violated equal protection, we said this:

"In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry. The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Id.*, at 79–80 (footnotes omitted).

Taken in full, the meaning of this paragraph is plain: through the exercise of the deportation and exclusion power, Congress exposes aliens to a treatment (expulsion) that cannot be imposed on citizens. The cases cited in the footnotes to this paragraph accordingly all concern Congress's power to enact grounds of exclusion or deportation. *Id.*, at 80, nn. 14–15 (citing *Kleindienst* v. *Mandel*, 408 U. S. 753 (1972); *Galvan* v. *Press*, 347 U. S. 522 (1954); and *Harisiades* v. *Shaughnessy*, 342 U. S. 580 (1952)); cf. *ante*, at 522 (quoting *Diaz, supra*, at 81, n. 17, in turn quoting *Harisiades*). Nothing in *Diaz* addresses due process protection of liberty or purports to sanction any particular limitation on the liberty of LPRs under circumstances comparable to those here.

Even on its terms, the *Diaz* statement is dictum. We acknowledged immediately that "[t]he real question presented by *[Diaz]* is not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination *within* the class of aliens—allowing benefits to some aliens but not to others—is permissible." 426 U. S., at 80. Our holding that Congress could consider length of residence and immigration status in allocating medical insurance in no way suggests the existence of a federal power to imprison a long-term resident alien when the Government concedes that there is no need to do so.

The Court does not explain why it believes the *Diaz* dictum to be relevant to this case, other than to repeat it and identify prior instances of its quotation. *Ante*, at 521–522. The Court resists calling the statement "'dictum,'" *ante*, at 521, but it does not deny that *Diaz* involved "discrimination *within* the class of aliens" rather than "discrimination between citizens and aliens," 426 U. S., at 80, thus making any suggestion about Congress's power to treat citizens and aliens differently unnecessary to the holding. Nor does the Court deny that *Diaz* dealt with an equal protection challenge to the allocation of medical insurance and had nothing to

ings, but that due process under the Fifth Amendment conditions a potentially lengthy detention on a hearing and an impartial decisionmaker's finding that detention is necessary to a governmental purpose. He thus invokes our repeated decisions that the claim of liberty protected by the Fifth Amendment is at its strongest when government seeks to detain an individual. THE CHIEF JUSTICE wrote in 1987 that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States* v. *Salerno,* 481 U. S. 739, 755. See also *Reno* v. *Flores,* 507 U. S. 292, 316 (1993) (O'CONNOR, J., concurring) ("'The institutionalization of an adult by the government triggers heightened, substantive due process scrutiny"); *Foucha* v. *Louisiana,* 504 U. S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *id.,* at 90 (KENNEDY, J., dissenting) ("As incarceration of persons is the most common and one of the most feared instruments of state oppression and state indifference, we ought to acknowledge at the outset that freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments of the Constitution").

Accordingly, the Fifth Amendment permits detention only where "heightened, substantive due process scrutiny" finds a "'sufficiently compelling'" governmental need. *Flores, supra,* at 316 (O'CONNOR, J., concurring) (quoting *Salerno,* 481 U. S., at 748). In deciding in *Salerno* that this principle did not categorically bar pretrial detention of criminal defendants without bail under the Bail Reform Act of 1984, it was crucial that the statute provided that, "[i]n a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.,* at 750 (citing 18 U. S. C.

---

say on the subject of the right of LPRs to protection of their liberty under the Due Process Clause. See *supra,* at 543–547.

§ 3142(f)). We stressed that the Act was not a "scattershot attempt to incapacitate those who are merely suspected of" serious offenses, 481 U. S., at 750, and held that due process allowed some pretrial detention because the Act confined it to a sphere of real need: "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." *Id.*, at 751; see also *Foucha, supra,* at 81 (calling the pretrial detention statute in *Salerno* a "sharply focused scheme").

We have reviewed involuntary civil commitment statutes the same way. In *Addington* v. *Texas,* 441 U. S. 418 (1979), we held that a State could not civilly commit the mentally ill without showing by "clear and convincing evidence" that the person was dangerous to others, *id.*, at 433. The elevated burden of proof was demanded because "[l]oss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id.*, at 427. The statutory deficiency was the same in *Foucha,* where we held that Louisiana's civil commitment statute failed due process because the individual was denied an "adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community." 504 U. S., at 81. See also *id.*, at 88 (opinion of O'CONNOR, J.) (civil commitment depends on a "necessary connection between the nature and purposes of confinement").

In addition to requiring a compelling reason for detention, we held that the class of persons affected must be narrow and, in pretrial-type lockup, the time must be no more than what is reasonably necessary before the merits can be resolved. In the case of the Bail Reform Act, we placed weight on the fact that the statute applied only to defendants suspected of "the most serious of crimes," *Salerno, supra,* at 747; see also *Foucha, supra,* at 81, while the statute in *Kansas* v. *Hendricks,* 521 U. S. 346 (1997), likewise provided

only for confinement of "a limited subclass of dangerous persons" who had committed "'a sexually violent offense'" and who suffered from "'a mental abnormality or personality disorder'" portending "'predatory acts of sexual violence,'" *id.,* at 357 (quoting Kan. Stat. Ann. § 59–29a02(a) (1994)). *Salerno* relied on the restriction of detention "by the stringent time limitations of the Speedy Trial Act," 481 U. S., at 747, whereas in *Foucha,* it was a fault that the statute did not impose any comparable limitation, 504 U. S., at 82 (citing *Salerno*). See also *Jackson* v. *Indiana,* 406 U. S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed").

The substantive demands of due process necessarily go hand in hand with the procedural, and the cases insist at the least on an opportunity for a detainee to challenge the reason claimed for committing him. *E. g., Hendricks, supra,* at 357 (stating that civil commitment was permitted where "the confinement takes place pursuant to proper procedures and evidentiary standards"); *Foucha, supra,* at 81–82 (invalidating a statute under which "the State need prove nothing to justify continued detention"); *Salerno, supra,* at 751 ("[T]he procedures by which a judicial officer evaluates the likelihood of future dangerousness are specifically designed to further the accuracy of that determination"); *Addington, supra,* at 427 (requiring a heightened burden of proof "to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered").

These cases yield a simple distillate that should govern the result here. Due process calls for an individual determination before someone is locked away. In none of the cases cited did we ever suggest that the government could avoid the Due Process Clause by doing what § 1226(c) does, by selecting a class of people for confinement on a categorical basis and denying members of that class any chance to dispute the

necessity of putting them away. The cases, of course, would mean nothing if citizens and comparable residents could be shorn of due process by this sort of categorical sleight of hand. Without any "full-blown adversary hearing" before detention, *Salerno, supra,* at 750, or heightened burden of proof, *Addington, supra,* or other procedures to show the government's interest in committing an individual, *Foucha, supra; Jackson, supra,* procedural rights would amount to nothing but mechanisms for testing group membership. Cf. *Foucha, supra,* at 88 (opinion of O'CONNOR, J.) ("Nor would it be permissible to treat all acquittees alike, without regard for their particular crimes"). And if procedure could be dispensed with so expediently, so presumably could the substantive requirements that the class of detainees be narrow and the detention period strictly limited. *Salerno, supra; Hendricks, supra.*

## C

We held as much just two Terms ago in *Zadvydas* v. *Davis,* 533 U. S. 678 (2001), which stands for the proposition that detaining an alien requires more than the rationality of a general detention statute; any justification must go to the alien himself. *Zadvydas* considered detention of two aliens, Zadvydas and Ma, who had already been ordered removed and therefore enjoyed no lawful immigration status. Their cases arose because actual removal appeared unlikely owing to the refusal of their native countries to accept them, with the result that they had been detained not only for the standard 90-day removal period, during which time most removal orders are executed, but beyond that period because the INS considered them to be a " 'risk to the community' " and " 'unlikely to comply with the order of removal.' " *Id.,* at 682 (quoting 8 U. S. C. § 1231(a)(6) (1994 ed., Supp. V)). Zadvydas and Ma challenged their continued and potentially indefinite detention under the Due Process Clause of the Fifth Amendment.

The *Zadvydas* opinion opened by noting the clear applicability of general due process standards: physical detention requires both a "special justification" that "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint'" and "adequate procedural protections." 533 U. S., at 690 (quoting *Hendricks*, 521 U. S., at 356). Nowhere did we suggest that the "constitutionally protected liberty interest" in avoiding physical confinement, even for aliens already ordered removed, was conceptually different from the liberty interest of citizens considered in *Jackson*, *Salerno*, *Foucha*, and *Hendricks*. On the contrary, we cited those cases and expressly adopted their reasoning, even as applied to aliens whose right to remain in the United States had already been declared forfeited. *Zadvydas*, 533 U. S., at 690.

Thus, we began by positing commonly accepted substantive standards and proceeded to enquire into any "special justification" that might outweigh the aliens' powerful interest in avoiding physical confinement "under [individually ordered] release conditions that may not be violated." *Id.*, at 696. We found nothing to justify the Government's position. The statute was not narrowed to a particularly dangerous class of aliens, but rather affected "aliens ordered removed for many and various reasons, including tourist visa violations." *Id.*, at 691. The detention itself was not subject to "stringent time limitations," *Salerno, supra*, at 747, but was potentially indefinite or even permanent, *Zadvydas*, 533 U. S., at 691. Finally, although both Zadvydas and Ma appeared to be dangerous, this conclusion was undermined by defects in the procedures resulting in the finding of dangerousness. *Id.*, at 692. The upshot was such serious doubt about the constitutionality of the detention statute that we construed it as authorizing continuing detention only when an alien's removal was "reasonably foreseeable." *Id.*, at 699. In the cases of Zadvydas and Ma, the fact that their countries of citizenship were not willing to accept their return weighed

against the Government's interest in keeping them at hand for instant removal, even though both were serious flight risks, *id.*, at 684–686, 690, and we remanded the cases to the Courts of Appeals for a determination of the sufficiency of the Government's interests in Zadvydas's and Ma's individual detention, *id.*, at 702.

Our individualized analysis and disposition in *Zadvydas* support Kim's claim for an individualized review of his challenge to the reasons that are supposed to justify confining him prior to any determination of removability. In fact, aliens in removal proceedings have an additional interest in avoiding confinement, beyond anything considered in *Zadvydas:* detention prior to entry of a removal order may well impede the alien's ability to develop and present his case on the very issue of removability. See Brief for Citizens and Immigrants for Equal Justice et al. as *Amici Curiae* 20–23. After all, our recognition that the serious penalty of removal must be justified on a heightened standard of proof, *Woodby* v. *INS*, 385 U. S. 276 (1966), will not mean all that much when the INS can detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence. Cf. *Stack* v. *Boyle*, 342 U. S. 1, 4 (1951). Kim's right to defend against removal gives him an even stronger claim than the aliens in *Zadvydas* could raise.

In fact, the principal dissenters in *Zadvydas*, as well as the majority, accepted a theory that would compel success for Kim in this case. The dissent relied on the fact that Zadvydas and Ma were subject to a "final order of removal" and had "no right under the basic immigration laws to remain in this country," 533 U. S., at 720 (opinion of KENNEDY, J.), in distinguishing them "from aliens with a lawful right to remain here," *ibid.*, which is Kim's position. The dissent recognized the right of all aliens, even "removable and inadmissible" ones, to be "free from detention that is arbitrary or capricious," *id.*, at 721, and the opinion explained that detention would pass the "arbitrary or capricious" test "when

necessary to avoid the risk of flight or danger to the community," *ibid.*[10]

Hence the *Zadvydas* dissent's focus on "whether there are adequate procedures" allowing "persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large." *Ibid.;* see also *id.,* at 722–723. Indeed, there is further support for Kim's claim in the dissent's view that the process afforded to removable aliens like Zadvydas and Ma "[went] far toward th[e] objective" of satisfying procedural due process, *id.,* at 722;[11] that process stands in stark contrast to the total ab-

---

[10] In support of its standard, the dissent relied on a report by the United Nations High Commissioner for Refugees, which likewise countenanced detention only "in cases of *necessity*" and stated, under a heading entitled "Guideline 3: Exceptional Grounds for Detention":

"There should be a presumption against detention. Where there are monitoring mechanisms which can be employed as viable alternatives to detention, (such as reporting obligations or guarantor requirements . . .), these should be applied *first* unless there is evidence to suggest that such an alternative will not be effective in the individual case. Detention should therefore only take place after a full consideration of all possible alternatives, or when monitoring mechanisms have been demonstrated not to have achieved the lawful and legitimate purpose." United Nations High Commissioner for Refugees, Revised Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum Seekers (Feb. 1999) (hereinafter Detention Guidelines) (emphasis in original), cited in *Zadvydas,* 533 U. S., at 721 (opinion of KENNEDY, J.).

The High Commissioner also referred to the "minimum procedural guarante[e]" for a detainee "either personally or through a representative, to challenge the necessity of the deprivation of liberty at the review hearing, and to rebut any findings made." Detention Guidelines, Guideline 5: Procedural Safeguards.

[11] The scheme considered in *Zadvydas* did not provide review immediately after the removability determination; the dissent noted that custody review hearings usually occurred within three months of a transfer to a postorder detention unit, with further reviews annually or more frequently if the alien requested them. 533 U. S., at 722–723. But the lag was fitted to the circumstances. In the usual case, removal in fact would

sence of custody review available in response to Kim's claim that he is neither dangerous nor a flight risk.[12]   The removable aliens in *Zadvydas* had the right to a hearing, to representation, and to consideration of facts bearing on risk of flight, including criminal history, evidence of rehabilitation, and ties to the United States.   *Ibid.*   The references to the "necessity" of an individual's detention and the discussion of the procedural requirements show that the principal *Zadvydas* dissenters envisioned due process as individualized review, and the Court of Appeals in this case correctly held that Kim's mandatory detention without benefit of individualized enquiry violated due process as understood by both the *Zadvydas* majority and JUSTICE KENNEDY in dissent.   *Kim* v. *Ziglar,* 276 F. 3d 523, 535–537 (CA9 2002).   Every Court of Appeals to consider the detention of

---

come promptly; it is only when it did not that interim custody raised a substantial issue.   The issue here, of course, is not timing but the right to individualized review at all.

[12] The hearing recognized in *Matter of Joseph,* 22 I. & N. Dec. 799 (BIA 1999), is no response to this deficiency.   As the Court notes, the "'*Joseph* hearing'" only permits an alien to show that he does not meet the statutory criteria for mandatory detention under § 1226(c).   *Ante,* at 514, and n. 3.   Kim argues that, even assuming that he fits under the statute, the statute's application to LPRs like him does not fit under the Due Process Clause.

JUSTICE KENNEDY recognizes that the Due Process Clause requires "an individualized determination as to [an LPR's] risk of flight and dangerousness if the continued detention [becomes] unreasonable or unjustified." *Ante,* at 532 (concurring opinion).   It is difficult to see how Kim's detention in this case is anything but unreasonable and unjustified, since the Government concedes that detention is not necessary to completion of his removal proceedings or to the community's protection.   Certainly the fact that "there is at least some merit to the [INS's] charge" that Kim should be held to be removable, *ante,* at 531, does not establish a compelling reason for detention.   The INS releases many noncriminal aliens on bond or on conditional parole under § 1226(a)(2) pending removal proceedings, and the fact that Kim has been convicted of criminal offenses does not on its own justify his detention, see *supra,* at 550–553.

an LPR under § 1226(c) after *Zadvydas* reached the same conclusion.[13]

## D

In sum, due process requires a "special justification" for physical detention that "outweighs the individual's constitutionally protected interest in avoiding physical restraint" as well as "adequate procedural protections." *Zadvydas,* 533 U. S., at 690–691 (internal quotation marks omitted). "There must be a 'sufficiently compelling' governmental interest to justify such [an] action, usually a punitive interest in imprisoning the convicted criminal or a regulatory interest in forestalling danger to the community." *Flores,* 507 U. S., at 316 (O'CONNOR, J., concurring) (quoting *Salerno,* 481 U. S., at 748). The class of persons subject to confinement must be commensurately narrow and the duration of confinement limited accordingly. *Zadvydas, supra,* at 691; *Hendricks,* 521 U. S., at 368; *Foucha,* 504 U. S., at 81–82; *Salerno, supra,* at 747, 750. JUSTICE KENNEDY's dissenting view in *Zadvydas,* like that of the majority, disapproved detention that is not "necessary" to counter a risk of flight or danger; it is "arbitrary or capricious" and violates the substantive component of the Due Process Clause. 533 U. S., at 721. Finally, procedural due process requires, at a minimum, that a detainee have the benefit of an impartial decisionmaker able to consider particular circumstances on the issue of necessity. *Id.,* at 691–692; *id.,* at 722 (KENNEDY, J., dissenting); *Foucha, supra,* at 81; *Salerno, supra,* at 750. See also *Kenyeres* v. *Ashcroft, post,* at 1305 (KENNEDY, J., in chambers) ("An opportunity to present one's meritorious grievances to a court supports the legitimacy and public acceptance of a statutory regime").

---

[13] *Welch* v. *Ashcroft,* 293 F. 3d 213 (CA4 2002); *Hoang* v. *Comfort,* 282 F. 3d 1247 (CA10 2002), cert. pending, No. 01–1616 [REPORTER'S NOTE: See *post,* p. 1010]; *Patel* v. *Zemski,* 275 F. 3d 299 (CA3 2001). The Seventh Circuit's decision in *Parra* v. *Perryman,* 172 F. 3d 954 (1999), preceded our decision in *Zadvydas.*

By these standards, Kim's case is an easy one. "[H]eightened, substantive due process scrutiny," *Flores, supra,* at 316 (O'CONNOR, J., concurring), uncovers serious infirmities in § 1226(c). Detention is not limited to dangerous criminal aliens or those found likely to flee, but applies to all aliens claimed to be deportable for criminal convictions, even where the underlying offenses are minor. *E. g., Michel* v. *INS,* 206 F. 3d 253, 256 (CA2 2000) (possession of stolen bus transfers); *Matter of Bart,* 20 I. & N. Dec. 436 (BIA 1992) (issuance of a bad check). Detention under § 1226(c) is not limited by the kind of time limit imposed by the Speedy Trial Act, and while it lasts only as long as the removal proceedings, those proceedings have no deadline and may last over a year. See Brief for Citizens and Immigrants for Equal Justice et al. as *Amici Curiae* 23–26; see also *id.,* at 10–20 (citing examples). Section 1226(c) neither requires nor permits an official to determine whether Kim's detention was necessary to prevent flight or danger.

Kim's detention without particular justification in these respects, or the opportunity to enquire into it, violates both components of due process, and I would accordingly affirm the judgment of the Court of Appeals requiring the INS to hold a bail hearing to see whether detention is needed to avoid a risk of flight or a danger to the community.[14] This is surely little enough, given the fact that 8 U. S. C. § 1536 gives an LPR charged with being a foreign terrorist the right to a release hearing pending a determination that he be removed.

### III

The Court proceeds to the contrary conclusion on the premise that "the Government may constitutionally detain

---

[14] Although Kim is a convicted criminal, we are not concerned here with a State's interest in punishing those who violate its criminal laws. Kim completed the criminal sentence imposed by the California courts on February 1, 1999, and California no longer has any interest in incarcerating him.

deportable aliens during the limited period necessary for their removal proceedings." *Ante,* at 526. Sometimes, maybe often, it may, but that is not the point in contention. Kim has never challenged the INS's general power to detain aliens in removal proceedings or even its power to detain him in particular, if it affords him a chance to participate in an enquiry whether he poses a flight risk or a danger to society.

The question, rather, is whether Congress has chosen "'a constitutionally permissible means of implementing' [its immigration] power." *Zadvydas, supra,* at 695 (quoting *INS* v. *Chadha,* 462 U. S. 919, 941–942 (1983)); see also *Carlson* v. *Landon,* 342 U. S. 524, 537 (1952) (stating that the deportation power "is, of course, subject to judicial intervention under the 'paramount law of the Constitution'"). As in *Zadvydas,* we are here concerned not with the power to remove aliens but with the "important constitutional limitations" on that power's exercise. *Zadvydas, supra,* at 695.[15]

---

[15] The Court's citations to *Wong Wing* v. *United States,* 163 U. S. 228 (1896), are therefore inapposite. *Ante,* at 523, 531. In *Wong Wing,* we hypothesized that detention "necessary to give effect" to the removal of an alien "would be valid"; the use of the subjunctive mood makes plain that the issue was not before the Court. 163 U. S., at 235. *Wong Wing* certainly did not hold that detention in aid of removal was exempt from the Due Process Clause.

Moreover, the *Wong Wing* dictum must be understood in light of the common contemporary practice in the federal courts of releasing aliens on bail pending deportation proceedings. While the Court is correct that the first statutory provision permitting Executive officials to release aliens on bond was enacted in 1907, *ante,* at 523, n. 7, the Court ignores the numerous judicial grants of bail prior to that year. See, *e. g., United States ex rel. Turner* v. *Williams,* 194 U. S. 279, 283 (1904) (stating that the lower court admitted the appellant to bail pending appeal to this Court); *Fong Yue Ting* v. *United States,* 149 U. S. 698, 704 (1893) (same); *United States* v. *Moy Yee Tai,* 109 F. 1 (CA2 1901) *(per curiam); In re Lum Poy,* 128 F. 974, 975 (CC Mont. 1904) (noting that "the practice in California, Idaho, and Oregon has been and is to admit Chinese persons to

## A

The Court spends much effort trying to distinguish *Zadvydas*, but even if the Court succeeded, success would not avail it much. *Zadvydas* was an application of principles developed in over a century of cases on the rights of aliens and the limits on the government's power to confine individuals. While there are differences between detention pending removal proceedings (this case) and detention after entry of a removal order *(Zadvydas)*, the differences merely point up

bail pending an investigation into the lawfulness of their residence within the United States, and before any order for deportation has been made"); *In re Ah Tai*, 125 F. 795, 796–797 (Mass. 1903) (identifying a practice in several federal districts admitting aliens to bail, both before an initial finding of deportability and during the appeal therefrom); *In re Chow Goo Pooi*, 25 F. 77, 78 (CC Cal. 1884). The breadth of this practice is evident from one court's statement that "[t]o hold bail altogether inadmissible . . . would invalidate hundreds of existing recognizances." *Ah Tai, supra,* at 797.

As Judge Augustus Hand later noted, the only change in 1907 was that bail decisions were committed to the discretion of Executive officials, rather than judges:

"Prior to the passage by Congress in 1907 of the act empowering the administrative official to fix bail, various courts made it a practice to grant bail to aliens during deportation hearings. . . . In our opinion that act was intended to place the general determination of granting bail in the hands of the authorities charged with the enforcement of the deportation laws as persons ordinarily best qualified to perform such a function . . . ." *United States ex rel. Potash* v. *District Director of Immigration and Naturalization*, 169 F. 2d 747, 751 (CA2 1948) (citations omitted).

Thus, while *Wong Wing* stated in passing that detention may be used where it was "part of the means necessary" to the removal of aliens, 163 U. S., at 235, that statement was written against the background of the general availability of judicial relief from detention pending deportation proceedings.

The judicial grants of bail prior to 1907 arose in federal habeas proceedings. Contrary to JUSTICE O'CONNOR's objection to federal jurisdiction in this matter, there is indeed a "history of routine reliance on habeas jurisdiction to challenge the detention of aliens without bail pending the conclusion of removal proceedings." *Ante*, at 536 (opinion concurring in part and concurring in judgment).

that Kim's is the stronger claim, see *supra*, at 554–556. In any case, the analytical framework set forth in *Salerno, Foucha, Hendricks, Jackson,* and other physical confinement cases applies to both, and the two differences the Court relies upon fail to remove Kim's challenge from the ambit of either the earlier cases or *Zadvydas* itself.[16]

First, the Court says that § 1226(c) "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings." *Ante,* at 528. Yes it does, and the statute in *Zadvydas,* viewed outside the context of any individual alien's detention, served the purpose of preventing aliens ordered to be deported from fleeing prior to actual deportation. In each case, the fact that a statute serves its purpose in general fails to justify the detention of an individual in particular. Some individual aliens covered by § 1226(c) have meritorious challenges to removability or claims for relief from removal. See Brief for Citizens and Immigrants for Equal Justice et al. as *Amici Curiae* 10–20. As to such aliens, as with Zadvydas and Ma, the Government has only a weak reason under the immigration laws for detaining them.

The Court appears to respond that Congress may require detention of removable aliens based on a general conclusion that detention is needed for effective removal of criminal aliens on a class-wide basis. But on that logic *Zadvydas* should have come out the other way, for detention of the entire class of aliens who have actually been ordered removed will in general "serv[e] the purpose" of their effective removal, *ante,* at 528. Yet neither the Court nor JUSTICE KENNEDY in dissent suggested that scrutiny under the Due Process Clause could be satisfied at such a general level. Rather, we remanded the individual cases of Zadvydas and Ma for determinations of the strength of the Government's

---

[16] The Court tellingly does not even mention *Salerno, Foucha, Hendricks,* or *Jackson.*

reasons for detaining them in particular. 533 U. S., at 702.[17] We can insist on nothing less here, since the Government's justification for detaining individuals like Zadvydas and Ma, who had no right to remain in this country and were proven flight risks and dangers to society, *id.*, at 684–686, is certainly stronger (and at least no weaker) than its interest in detaining a lawful permanent resident who has not been shown (or even claimed) to be either a flight risk or a threat to the community.[18]

The Court's closest approach to a reason justifying classwide detention without exception here is a Senate Report stating that over 20% of nondetained criminal aliens failed

[17] The Court is therefore mistaken in suggesting that I view the detention of the individual aliens in *Zadvydas* as serving a governmental purpose. *Ante*, at 527, n. 10. The Court confuses the "statute in *Zadvydas*, viewed outside the context of any individual alien's detention," *supra*, at 561, with the "detention at issue in *Zadvydas*," *ante*, at 527, n. 10, namely, the detention of Zadvydas and Ma as individuals. The due process analysis in *Zadvydas* concentrated on the latter, holding that the detention of Zadvydas and Ma would not serve a legitimate immigration purpose if there were no "significant likelihood of removal in the reasonably foreseeable future." 533 U. S., at 701. Thus, the Court's suggestion in this case that "the statutory provision" authorizes "detention" that prevents deportable aliens from fleeing as a general matter, *ante*, at 527–528, is no sufficient basis for claiming *Zadvydas* as support for the Court's methodology or result. Rather, the Court should consider whether the detention of Kim as an individual is necessary to a compelling Government interest, just as it did for the detention of Zadvydas and Ma as individuals. As the Government concedes, Kim's individual detention serves no Government purpose at all.

[18] Nor can the general risk of recidivism, *ante*, at 518–519, justify this measure. The interest in preventing recidivism may be vindicated "by the ordinary criminal processes involving charge and conviction, the use of enhanced sentences for recidivists, and other permissible ways of dealing with patterns of criminal conduct." *Foucha* v. *Louisiana*, 504 U. S. 71, 82 (1992). The ability to detain aliens in removal proceedings who pose threats to the community also satisfies this interest. Cf. *United States* v. *Salerno*, 481 U. S. 739 (1987). The alternative to detention, of course, is not unrestricted liberty, but supervised release, which also addresses the risk of recidivism. *Zadvydas*, 533 U. S., at 696.

to appear for removal hearings. *Ante,* at 519 (citing S. Rep. No. 104–48 (1995) (hereinafter Senate Report)). To begin with, the Senate Report's statistic treats all criminal aliens alike and does not distinguish between LPRs like Kim, who are likely to have developed strong ties within the United States, see *supra,* at 544–547, and temporary visitors or illegal entrants. Even more importantly, the statistic tells us nothing about flight risk at all because, as both the Court and the Senate Report recognize, the INS was making its custody determinations not on the ground of likelihood of flight or dangerousness, but "in large part, according to the number of beds available in a particular region." Senate Report 23, cited *ante,* at 519; see also H. R. Rep. No. 104–469, p. 124 (1995) (hereinafter House Report) ("[I]n deciding to release a deportable alien, the INS is making a decision that the alien cannot be detained given its limited resources"); App. 26–27. This meant that the INS often could not detain even the aliens who posed serious flight risks. Senate Report 23 (noting that the INS had only 3,500 detention beds for criminal aliens in the entire country and the INS district comprising Pennsylvania, Delaware, and West Virginia had only 15). The desperate lack of detention space likewise had led the INS to set bonds too low, because "if the alien is not able to pay, the alien cannot be released, and a needed bed space is lost." House Report 124. The Senate Report also recognized that, even when the INS identifies a criminal alien, the INS "often refuses to take action because of insufficient agents to transport prisoners, or because of limited detention space." Senate Report 2. Four former high-ranking INS officials explained the Court's statistics as follows: "Flight rates were so high in the early 1990s not as a result of chronic discretionary judgment failures by [the] INS in assessing which aliens might pose a flight risk. Rather, the rates were alarmingly high because decisions to release aliens in proceedings were driven over-

whelmingly by a lack of detention facilities." Brief for T. Alexander Aleinikoff et al. as *Amici Curiae* 19.

The Court's recognition that, at the time of the enactment of § 1226(c), "individualized bail determinations had not been tested under optimal conditions" is thus rather an understatement. *Ante*, at 528. The Court does not explain how the INS's resource-driven decisions to release individuals who pose serious flight risks, and their predictable failure to attend removal hearings, could justify a systemwide denial of any opportunity for release to individuals like Kim who are neither flight risks nor threats to the public.

The Court also cites a report by the Department of Justice relied upon by the Government. Department of Justice, Office of the Inspector General, Immigration and Naturalization Service, Deportation of Aliens After Final Orders Have Been Issued, Rep. No. I–96–03 (Mar. 1996), App. 14 (hereinafter Post-Order Report), cited *ante*, at 519, 521. But that report does not even address the issue of detention before a determination has been made that an alien is removable. As its title indicates, the Post-Order Report analyzed removal rates only for aliens who had already received final orders of removability.[19] See also Post-Order Report, App. 25 ("This current review was limited to actions taken by INS to remove aliens after [immigration judges or the Board of Immigration Appeals] had issued final orders").[20]

---

[19] Detention of such aliens is governed by the statute at issue in *Zadvydas*, § 1231(a), not by § 1226(c).

[20] A prior study by the same body noted that nonappearance rates by aliens in deportation proceedings before issuance of orders to deport (aliens, that is, like Kim) were approximately 23% for the first half of 1993 and 21% for all of 1992. Department of Justice, Office of the Inspector General, Case Hearing Process in the Executive Office for Immigration Review, Rep. No. I–93–03, p. 5 (May 1994) (hereinafter Case Hearing Report). Congress appears to have considered these relevant figures, Senate Report 2 ("Over 20 percent of nondetained criminal aliens fail to appear for deportation proceedings"), without referring to irrelevant postorder numbers. The Government relied on the Post-Order Report

More relevant to this case, and largely ignored by the Court, is a recent study conducted at the INS's request concluding that 92% of criminal aliens (most of whom were LPRs) who were released under supervisory conditions attended all of their hearings. 1 Vera Institute of Justice, Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program, pp. ii, 33, 36 (Aug. 1, 2000) (hereinafter Vera Institute Study). Even without supervision, 82% of criminal aliens released on recognizance showed up, as did 77% of those released on bond, leading the reporters to conclude that "supervision was especially effective for criminal aliens" and that "mandatory detention of virtually all criminal aliens is not necessary." *Id.*, at ii, 36, 42.[21]

---

in its brief and at oral argument. Brief for Petitioners 7, 19–20, and n. 7; Tr. of Oral Arg. 23. The Government did not cite the Case Hearing Report.

[21] The Court throws in minor criticisms of the Vera Institute Study that have no bearing on its relevance here. The institute's supervised release program included 127 criminal aliens who would be subject to mandatory detention under § 1226(c) because of their criminal histories. Vera Institute Study 33. Since the INS seeks Kim's removal on the grounds of either crimes of moral turpitude or an aggravated felony, see *ante*, at 513, n. 1, the fact that most of the Vera Institute Study's subjects were convicted of crimes of moral turpitude but not an aggravated felony, *ante*, at 520, n. 5, is of no moment. Nor were all of the aliens studied subject to intensive supervision, *ibid.;* most were subject to "regular supervision," which involved no mandatory reporting sessions beyond an initial orientation session with supervision staff and required only that the alien keep the staff apprised of a current mailing address, appear in court, and comply with the orders of the immigration judge, Vera Institute Study 17–18. That the institute considered various screening criteria before authorizing supervised release, *ante*, at 520, n. 5, does not undermine the value of the study, since any program adopted by the INS in lieu of mandatory detention could do the same. Cf. *Zadvydas*, 533 U. S., at 696. Finally, the fact that Kim sought and was granted release on bond rather than supervised release, *ante*, at 520, n. 5, does not detract from the relevance of the Vera Institute Study. Regardless of what methods the INS decides to employ to prevent flight, the study supports the conclusion that mandatory deten-

The Court nowhere addresses the Vera Institute's conclusion that criminal aliens released under supervisory conditions are overwhelmingly likely to attend their hearings. Instead, the Court fixes on the fact that 23% of the comparison group of aliens released on bond failed to attend all of their hearings. *Ante,* at 519–520. Since the bond determinations were made by the INS, the fact remains that resource-driven concerns may well have led the INS to release individuals who were evident flight risks on bonds too low to ensure their attendance. See *supra,* at 563–564. The Court's assumption that the INS's bond determinations involved "individualized screening" for flight risk, *ante,* at 520, finds no support in the Vera Institute Study. Thus the Court's reliance on the failure rate of aliens released by the INS on bond, whether it comes from the Senate Report or the Vera Institute Study, *ante,* at 519–520, does not support its conclusion.

In sum, the Court's inapposite statistics do not show that detention of criminal LPRs pending removal proceedings, even on a general level, is necessary to ensure attendance at removal hearings, and the Vera Institute Study reinforces the point by establishing the effectiveness of release under supervisory conditions, just as we did in *Zadvydas.* 533 U. S., at 696 (noting that imprisonment was constitutionally suspect given the possibility of "supervision under release conditions that may not be violated").[22] The Court's first attempt to distinguish *Zadvydas* accordingly fails.

---

tion under § 1226(c) is "not necessary" to prevent flight, Vera Institute Study 42, and therefore violates the Due Process Clause.

[22] This case accordingly presents no issue of " 'court ordered release,' " *ante,* at 530, n. 14 (quoting *Zadvydas, supra,* at 713 (KENNEDY, J., dissenting)); in this case, for example, the INS reached its own determination to release Kim on bond. This case concerns only the uncontroversial requirement that detention serve a compelling governmental interest and that detainees be afforded adequate procedures ensuring against erroneous confinement. *E. g., Salerno,* 481 U. S., at 751 ("[T]he procedures by

The Court's second effort is its claim that mandatory detention under § 1226(c) is generally of a "much shorter duration" than the incarceration at issue in *Zadvydas*. *Ante*, at 528. While it is true that removal proceedings are unlikely to prove "indefinite and potentially permanent," 533 U. S., at 696, they are not formally limited to any period, and often extend beyond the time suggested by the Court, that is, "an average time of 47 days" or, for aliens who exercise their right of appeal, "an average of four months," *ante*, at 529; see also Case Hearing Report 12 (finding that the average time from receipt of charging documents by a detained alien to a final decision by the immigration judge was 54 days). Even taking these averages on their face, however, they are no legitimate answer to the due process claim to individualized treatment and hearing.

In the first place, the average time from receipt of charging documents to decision obscures the fact that the alien may receive charging documents only after being detained for a substantial period. Kim, for example, was not charged until five weeks after the INS detained him. Brief for Respondent 9.

Even more revealing is an explanation of the raw numbers that are averaged out. As the Solicitor General conceded, the length of the average detention period in great part reflects the fact that the vast majority of cases involve aliens who raise no challenge to removability at all. Tr. of Oral Arg. 57. LPRs like Kim, however, will hardly fit that pattern. Unlike many illegal entrants and temporary nonimmigrants, LPRs are the aliens most likely to press substantial

---

which a judicial officer evaluates the likelihood of future dangerousness are specifically designed to further the accuracy of that determination"); see also *Zadvydas, supra*, at 721 (KENNEDY, J., dissenting) (stating that due process requires "adequate procedures" permitting detained aliens to show that "they no longer present special risks or danger" warranting confinement).

challenges to removability requiring lengthy proceedings.[23] See Vera Institute Study 33, 37 (stating that many of the criminal aliens studied were "lawful permanent residents who have spent much or all of their adult lives in the United States" and that 40% of those released on supervision "were allowed to stay in the United States"). Successful challenges often require several months of proceedings, see Brief for Citizens and Immigrants for Equal Justice et al. as *Amici Curiae* 10–20; detention for an open-ended period like this falls far short of the "stringent time limitations" held to be significant in *Salerno*, 481 U. S., at 747. The potential for several months of confinement requires an individualized finding of necessity under *Zadvydas*.[24]

## B

The Court has failed to distinguish *Zadvydas* in any way that matters. It does no better in its effort to portray its result in this case as controlled by *Carlson* v. *Landon*, 342 U. S. 524 (1952), and *Reno* v. *Flores*, 507 U. S. 292 (1993).

---

[23] Criminal aliens whose "removal proceedings are completed while [they are] still serving time for the underlying conviction," *ante*, at 529, are irrelevant to this case, since they are never detained pending removal proceedings under § 1226(c).

[24] The Court calls several months of unnecessary imprisonment a "very limited time," *ante*, at 529, n. 12. But the due process requirement of an individualized finding of necessity applies to detention periods shorter than Kim's. *Schall* v. *Martin*, 467 U. S. 253 (1984), involved a maximum detention period of 17 days, *id.*, at 270, yet our due process analysis noted that the detainee was entitled to a hearing in which he could challenge the necessity of his confinement before an impartial decisionmaker required to state the facts and reasons underlying any decision to detain, *id.*, at 276–277. The 90-day removal period in § 1231(a)(1) not only has a fixed endpoint, but also applies only after the alien has been adjudged removable, § 1231(a)(1)(B). The discussion of that provision in *Zadvydas* cannot be read to indicate any standard of permissible treatment of an LPR who has not yet been found removable.

*Carlson* did not involve mandatory detention. It involved a system similar to the one Kim contends for here. The aliens' detention pending deportation proceedings in *Carlson* followed a decision on behalf of the Attorney General that custody was preferable to release on bond or on conditional parole. 342 U. S., at 528, n. 5 (citing Internal Security Act of 1950, § 23, 64 Stat. 1011). We sustained that decision because we found that the District Director of the INS, to whom the Attorney General had delegated the authority, did not abuse his discretion in concluding that "evidence of membership [in the Communist Party] plus personal activity in supporting and extending the Party's philosophy concerning violence" made the aliens "a menace to the public interest." 342 U. S., at 541. The significance of looking to "personal activity" in our analysis was complemented by our express recognition that there was "no evidence or contention that all persons arrested as deportable . . . for Communist membership are denied bail," *id.*, at 541–542, and by a Government report showing that in fact "the large majority" of aliens arrested on charges comparable to the *Carlson* petitioners' were allowed bail. *Id.*, at 542; see also *id.*, at 538, n. 31 (noting that it was "quite clear" that "detention without bond has been the exception").

Indeed, the *Carlson* Court's constitutional analysis relying on the opportunity for individualized bond determinations simply followed the argument in the brief for the United States in that case. In response to the aliens' argument that the statute made it "mandatory on the Attorney General to deny bail to alien communists," the Government stated, "[w]e need not consider the constitutionality of such a law for that is not what the present law provides." Brief for Respondent in *Carlson* v. *Landon*, O. T. 1951, No. 35, p. 19; see also *id.*, at 20 ("[T]he act itself, by its terms, leaves no doubt that the power to detain is discretionary, not mandatory"). The

Government also presented the following excerpt of a statement of the chairman of the House Judiciary Committee:

> " 'No particular hardship is going to be worked on anyone because, bear this fact in mind, *it is not mandatory on the Attorney General to hold people in detention. He is given discretionary power.* If in his judgment one of the class of people I have just mentioned ought to be held for paramount national reasons, he may detain him, but he is not obliged to hold anybody, *although I trust that in every case of a subversive or a hardened criminal he will.'* " *Id.*, at 19 (quoting 96 Cong. Rec. 10449–10450 (1950) (statement of Rep. Walter) (emphasis added in Brief for Respondent in *Carlson* v. *Landon, supra*)).

In short, *Carlson* addressed a very different scheme from the one here.

It is also beside the point for the Court to suggest that "like respondent in the present case," the *Carlson* petitioners challenged their detention because "there had been no finding that they were unlikely to appear for their deportation proceedings." *Ante*, at 524. Each of them was detained after being found to be "a menace to the public interest," 342 U. S., at 541, and their challenge, unlike Kim's, was that the INS had locked them up for an impermissible reason (danger to society) whereas only a finding of risk of flight would have justified detention. *Id.*, at 533–534 ("It is urged . . . that where there is no evidence to justify a fear of unavailability for the hearings or for the carrying out of a possible judgment of deportation, denial of bail under the circumstances of these cases is an abuse of discretion"); see also *id.*, at 551 (Black, J., dissenting) ("A power to put in jail because dangerous cannot be derived from a power to deport").[25]

---

[25] Similarly, the question presented in *Butterfield* v. *Zydok*, argued and decided together with *Carlson*, was "[w]hether, in exercising his discretion to grant or withhold bail pending final determination of the deportability

We rejected that contention, leaving the petitioners in detention because they were dangerous to the public interest, and on that issue, an official had determined that the *Carlson* petitioners ought to be detained. Here, however, no impartial decisionmaker has determined that detaining Kim is required for any purpose at all, and neither the Government nor the Court even claims such a need.

For the same reason it is beside the point to note that the unsuccessful *Carlson* petitioners' brief raised a claim that detention without reference to facts personal to their individual cases would violate the Due Process Clause. *Ante,* at 524. As the United States pointed out in its own *Carlson* brief, that issue was never presented, since the District Director's exercise of discretion was based on individualized determinations that the petitioners were dangerous to society. See *supra,* at 570.[26] Nor is the Court entitled to invoke *Carlson* by saying that the INS "had adopted a policy of refusing to grant bail" to alien Communists, which made the Attorney General's discretion to release aliens on bond merely "ostensibl[e]." *Ante,* at 524. The *Carlson* Court found that "[t]here is no evidence or contention that all per-

.  of an alien, the Attorney General is justified in denying bail on the ground that the alien is an active participant in Communist Party affairs, or whether he is bound also to consider other circumstances, particularly the likelihood that the alien will report as ordered." Pet. for Cert. in *Butterfield* v. *Zydok,* O. T. 1951, No. 136, p. 2.

[26] While a prior conviction may sometimes evidence a risk of future danger, it is not conclusive in all cases, and Kim is a good example, given that the Government found that he "would not be considered a threat." App. 13. Indeed, the Court acknowledges that convictions are only "relevant to" dangerousness, *ante,* at 525, n. 9; it does not state that they compel a finding of danger in all cases. As even the *Zadvydas* dissent recognized, due process requires that detained criminal aliens be given an opportunity to rebut the necessity of detention by showing "that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large." 533 U. S., at 721 (opinion of KENNEDY, J.).

sons arrested as deportable . . . for Communist membership are denied bail." 342 U. S., at 541–542.

The Court refuses to accept the opinion of the *Carlson* Court and the representations made in the successful brief for the Government in that case. The Court not only fails to acknowledge the actual holding of *Carlson;* it improperly adopts as authority statements made in dissent. The Court's emphatic assertion that "[t]here was no 'individualized findin[g]' of likely future dangerousness as to any of the aliens," *ante,* at 525, rests entirely on opinions voiced in dissent, although the Court only mentions this fact in a footnote, *ante,* at 525, n. 8 (citing 342 U. S., at 549, 550, n. 5, 552 (Black, J., dissenting), and *id.,* at 567 (Frankfurter, J., dissenting)). Statements made in dissent do not override the *Carlson* Court's express finding that the petitioners in that case were found to be not only members of the Communist Party, but "active in Communist work" and to "a degree, minor perhaps in [one] case, [participants] in Communist activities." *Id.,* at 541.[27]

Moreover, the *Carlson* dissenters did not suggest that no individualized determinations had occurred; rather, they contended that the District Director's individual findings of dangerousness were unsupported by sufficient reliable evidence. See *id.,* at 549–550 (Black, J., dissenting) (arguing that the aliens were not in fact "'dangerous'" at all); *id.,* at 552 (arguing that danger findings were based on "the rankest hearsay evidence" instead of the INS being "required to prove" that the detainee was dangerous); *id.,* at 555–556 (arguing that activity within the Communist movement did not make the aliens "dangerous"); *id.,* at 566–567 (Frankfurter, J.,

---

[27] In the footnote immediately following its citation of dissenting opinions, the Court cites a passage from the *Carlson* majority opinion confirming that the *Carlson* petitioners' detention rested on the "allegation, supported by affidavits, that the [INS's] dossier of each petitioner contained evidence" of Communist Party membership and activities "to the prejudice of the public interest." 342 U. S., at 530 (quoted *ante,* at 525, n. 9).

dissenting) (arguing that evidence of Communist party membership was "insufficient to show danger"; that evidence of some aliens' activities was stale; and that the history of treatment of the aliens involved forced him to conclude that the Attorney General was not actually exercising discretion on an individual basis).[28]   And even if the *Carlson* dissenters were factually correct, all that would show is that the *Carlson* Court was misled (by the Government, no less) into deciding the case on the basis that individualized findings of dangerousness were made.   Given that the *Carlson* Court clearly believed that it was deciding a case in which individualized determinations occurred, it is serious error for this Court to treat *Carlson* as deciding a case in which they did not.

Finally, the Court gets no help from the isolated passages of the *Carlson* opinion that it quotes.   Although the *Carlson* Court stated that detention was "'a part'" of deportation procedure, *ante*, at 524 (quoting *Carlson*, 342 U. S., at 538), it nowhere said that detention was part of every deportation proceeding.   Instead, it acknowledged that "the far larger part" of aliens deportable on "subversive charges" were re-

---

[28] Justice Black's dissenting statement that one of the aliens was "'not likely to engage in any subversive activities,'" 342 U. S., at 549, does not amount to a "specific finding of nondangerousness," *ante*, at 525.   On the contrary, the Court expressly stated that the Government could prove dangerousness based on "personal activity" in the Communist Party; it simply was not required to go so far as to show "specific acts of sabotage or incitement to subversive action." *Carlson, supra*, at 541.   Thus while there was no finding of "subversive action," there certainly was a finding of "danger," albeit one that Justice Black found unconvincing.

Likewise, Justice Frankfurter's statement in dissent that the Solicitor General of the United States had "advised" that "it has been the Government's policy . . . to terminate bail" for aliens awaiting deportation who were "present active Communists," 342 U. S., at 568, is difficult to reconcile with the contrary statements in both the majority opinion and the United States's brief in *Carlson*, see *supra*, at 569–572.   Whatever its basis, Justice Frankfurter's reference to a "policy" of bail denials does not bear the weight that the Court places upon it today.

leased on "modest bonds or personal recognizances" pending their deportation proceedings. *Id.*, at 538, n. 31. Contrary to the Court's holding today, the *Carlson* Court understood that discretion to admit to bail was necessary, since "[o]f course [a] purpose to injure [the United States] could not be imputed generally to all aliens subject to deportation." *Id.*, at 538. It was only in this light that the Court said that the INS could "justify [its] refusal of bail by reference to the legislative scheme to eradicate the evils of Communist activity"; the Court was referring to the INS's power to detain on a finding that a given alien was engaged in Communist activity that threatened society. *Id.*, at 543. The Court nowhere addressed, much less approved, the notion that the INS could justify, or that Congress could compel, an individual's detention without any determination at all that his detention was necessary to some Government purpose. And if there was ever any doubt on this point, it failed to survive our subsequent, unanimous recognition that the detention scheme in *Carlson* required "some level of individualized determination" as a precondition to detention. *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 194–195 (1991); see also *Flores*, 507 U. S., at 313. *Carlson* stands at odds with the Court's outcome in this case.

### 2

The Court's paragraph on *Flores, supra,* is no more help to it. Like *Carlson, Flores* did not involve mandatory detention, and the INS regulation at issue in *Flores* actually required that alien juveniles be released pending removal proceedings unless the INS determined that detention was required "'to secure [the juvenile's] timely appearance before the [INS] or the immigration court or to ensure the juvenile's safety or that of others.'" 507 U. S., at 297 (quoting 8 CFR § 242.24(b)(1) (1992)). Again, Kim agrees that such a system is constitutional and contends for it here. *Flores* turned not on the necessity of detention, but on the regulation's restric-

tion that alien juveniles could only be released to the custody of the juvenile's parent, legal guardian, or another specified adult relative. Even this limitation, however, was subject to exception for releasing a juvenile to another person in " 'unusual and compelling circumstances and in the discretion of the [INS] district director or chief patrol agent.' " 507 U. S., at 297 (quoting 8 CFR § 242.24(b)(4) (1992)).

Thus, the substantive due process issue in *Flores* was not whether the aliens' detention was necessary to a governmental purpose: " 'freedom from physical restraint' " was "not at issue" at all because, as juveniles, the aliens were " 'always in some form of custody.' " 507 U. S., at 302 (quoting *Schall* v. *Martin*, 467 U. S. 253, 265 (1984)). Since " '[l]egal custody' rather than 'detention' more accurately describes the reality of the arrangement" in *Flores*, 507 U. S., at 298, that case has no bearing on this one, which concerns the detention of an adult.[29]

*Flores* is equally distinguishable at the procedural level. We held that the procedures for the custody decision sufficed constitutionally because any determination to keep the alien "in the custody of the [INS], released on recognizance, or released under bond" was open to review by the immigration court, the Board of Immigration Appeals, and the federal courts. *Id.*, at 308. Like the aliens in *Carlson*, the juveniles in *Flores* were subject to a different system and raised a different complaint from Kim's.

While *Flores* holds that the INS may use "reasonable presumptions and generic rules" in carrying out its statutory discretion, 507 U. S., at 313, it gave no *carte blanche* to gen-

---

[29] Nor is it to the point for the Court to quote *Flores* as rejecting the aliens' challenge to a " ' "blanket" presumption of the unsuitability of custodians other than parents, close relatives, and guardians.' " *Ante*, at 526 (quoting 507 U. S., at 313). *Flores* expressly stated that the regulation did not implicate the core liberty interest in avoiding physical confinement. *Id.*, at 302 ("The 'freedom from physical restraint' . . . is not at issue in this case").

eral legislation depriving an entire class of aliens of liberty during removal proceedings. *Flores* did not disturb established standards that detention of an adult must be justified in each individual instance.[30]

## IV

This case is not about the National Government's undisputed power to detain aliens in order to avoid flight or prevent danger to the community. The issue is whether that power may be exercised by detaining a still lawful permanent resident alien when there is no reason for it and no way to challenge it. The Court's holding that the Due Process Clause allows this under a blanket rule is devoid of even ostensible justification in fact and at odds with the settled standard of liberty. I respectfully dissent.

JUSTICE BREYER, concurring in part and dissenting in part.

I agree with the majority that the courts have jurisdiction, and I join Part I of its opinion. If I believed (as the majority apparently believes, see *ante,* at 513–514, and n. 3) that Kim had conceded that he is deportable, then I would conclude that the Government could detain him without bail for the few weeks ordinarily necessary for formal entry of a removal order. Brief for Petitioners 39–40; see *ante,* at 528–531. Time limits of the kind set forth in *Zadvydas* v. *Davis,* 533 U. S. 678 (2001), should govern these and longer periods of detention, for an alien's concession that he is deportable

---

[30] Indeed, the passages the Court quotes from *Flores* did not concern the regulation's constitutionality at all, but rather its validity as an implementation of the authorizing statute. *Id.,* at 313 ("Respondents also contend that the INS regulation violates the statute because it relies upon a 'blanket' presumption"). *Flores* clearly separated its analysis of the regulation under the Due Process Clause from its analysis of the regulation under the statute. See *id.,* at 300; see also *id.,* at 318–319 (O'CONNOR, J., concurring) (pointing out the substantive due process analysis at *id.,* at 301–306, and the procedural due process analysis at *id.,* at 306–309).

seems to me the rough equivalent of the entry of an order of removal. See *id.*, at 699–701 (reading the statute, under constitutional compulsion, as commonly imposing a presumption of a 6-month "reasonable" time limit for post-removal-order detention).

This case, however, is not one in which an alien concedes deportability. As JUSTICE SOUTER points out, Kim argues to the contrary. See *ante*, at 541–542 (opinion concurring in part and dissenting in part). Kim claims that his earlier convictions were neither for an " 'aggravated felony' " nor for two crimes of " 'moral turpitude.' " Brief for Respondent 3, 11–12, 31–32, and n. 29. And given shifting lower court views on such matters, I cannot say that his arguments are insubstantial or interposed solely for purposes of delay. See, *e. g., United States* v. *Corona-Sanchez,* 291 F. 3d 1201, 1213 (CA9 2002) (petty theft with a prior not an "aggravated felony"). Compare *Omagah* v. *Ashcroft,* 288 F. 3d 254, 259 (CA5 2002) (" 'Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved' "), with *Guarneri* v. *Kessler,* 98 F. 2d 580, 580–581 (CA5 1938) ("Moral turpitude" involves " '[a]nything done contrary to justice, honesty, principle or good morals' "), and *Quilodran-Brau* v. *Holland,* 232 F. 2d 183, 184 (CA3 1956) ("The borderline of 'moral turpitude' is not an easy one to locate").

That being so—as long as Kim's legal arguments are neither insubstantial nor interposed solely for purposes of delay—then the immigration statutes, interpreted in light of the Constitution, permit Kim (if neither dangerous nor a flight risk) to obtain bail. For one thing, Kim's constitutional claims to bail in these circumstances are strong. See *ante,* at 548–552, 557–558 (SOUTER, J., concurring in part and dissenting in part). Indeed, they are strong enough to require us to "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may

be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); accord, *Zadvydas, supra,* at 689.

For another, the relevant statutes literally say nothing about an individual who, armed with a strong argument against deportability, might, or might not, fall within their terms. Title 8 U. S. C. § 1226(c) tells the Attorney General to "take into custody any alien who . . . *is* deportable" (emphasis added), not one who may, or may not, fall into that category. Indeed, the Government now permits such an alien to obtain bail if his argument against deportability is significantly *stronger* than substantial, *i. e.,* strong enough to make it "substantially unlikely" that the Government will win. *Matter of Joseph,* 22 I. & N. Dec. 799 (BIA 1999). Cf. 8 CFR § 3.19(h)(2)(ii) (2002).

Finally, bail standards drawn from the criminal justice system are available to fill this statutory gap. Federal law makes bail available to a criminal defendant after conviction and pending appeal provided (1) the appeal is "not for the purpose of delay," (2) the appeal "raises a substantial question of law or fact," and (3) the defendant shows by "clear and convincing evidence" that, if released, he "is not likely to flee or pose a danger to the safety" of the community. 18 U. S. C. § 3143(b). These standards give considerable weight to any special governmental interest in detention (*e. g.,* process-related concerns or class-related flight risks, see *ante,* at 528). The standards are more protective of a detained alien's liberty interest than those currently administered in the Immigration and Naturalization Service's *Joseph* hearings. And they have proved workable in practice in the criminal justice system. Nothing in the statute forbids their use when § 1226(c) deportability is in doubt.

I would interpret the (silent) statute as imposing these bail standards. Cf. *Zadvydas, supra,* at 698; *United States* v. *Witkovich,* 353 U. S. 194, 201–202 (1957); *Kent* v. *Dulles,* 357 U. S. 116, 129 (1958). So interpreted, the statute would require the Government to permit a detained alien to seek

an individualized assessment of flight risk and dangerousness as long as the alien's claim that he is not deportable is (1) not interposed solely for purposes of delay and (2) raises a question of "law or fact" that is not insubstantial. And that interpretation, in my view, is consistent with what the Constitution demands. I would remand this case to the Ninth Circuit to determine whether Kim has raised such a claim.

With respect, I dissent from the Court's contrary disposition.